01-1535-cr(L)

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: December 10, 2007                    Decided: November 24, 2008)

Docket Nos. 01-1535-cr (L), 01-1550-cr (con), 01-1553-cr (con),
01-1571-cr (con), 05-6149-cr (con), 05-6704-cr (con)

In re TERRORIST BOMBINGS OF U.S. EMBASSIES IN EAST AFRICA,

UNITED STATES OF AMERICA,

*Appellee*,

v.

MOHAMED SADEEK ODEH, also known as Abu Moath, also known as Noureldine, also known as
Marwan, also known as Hydar, MOHAMED RASHED DAOUD AL-'OWHALI, also known as Khalid Salim
Saleh Bin Rashed, also known as Moath, also known as Abdul Jabbar-Ali Abel-Latif, WADIH EL HAGE
also known as Abdus Sabbur,

*Defendants-Appellants*,

KHALFAN KHAMIS MOHAMED, also known as Khalfan Khamis,

*Defendant*.

Before: FEINBERG, NEWMAN, and CABRANES, *Circuit Judges*.

Defendants appeal from judgments of conviction entered by the United States District Court

for the Southern District of New York (Leonard B. Sand, *Judge*) following a jury trial in which

defendants were found guilty of offenses arising from their involvement in an international

conspiracy—led by Osama Bin Laden and organized through the al Qaeda terrorist network—to kill

American citizens and destroy American facilities across the globe.  One defendant also appeals post-

conviction orders entered by the District Court (Kevin Thomas Duffy, *Judge*).  One or more of the

defendants contend that (1) the indictment was not sufficient to support a conviction of a capital offense; (2) insufficient evidence supported the convictions; (3) the District Court's application of the Classified Information Procedures Act violated the Constitution; (4) a severance motion should have been granted; (5) statements attributed to co-defendants, co-conspirators, and other third parties should not have been admitted; (6) the government withheld exculpatory evidence; (7) cumulative error resulted in the deprivation of a fair trial; (8) certain sentencing enhancements were improper; and (9) the mandatory application of the Sentencing Guidelines warrants a remand of one defendant's case for re-sentencing. We see no merit in any but the last of these contentions. For the reasons stated in this opinion, as well as those set forth in *In re Terrorist Bombings of U.S. Embassies in East Africa (Fourth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008), and *In re Terrorist Bombings of U.S. Embassies in East Africa (Fifth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008), both filed today, the judgments are affirmed in part and remanded with respect to El-Hage only for re-sentencing.

> DAVID RASKIN and LESLIE C. BROWN, Assistant United States Attorneys (Michael J. Garcia, United States Attorney, *on the brief,* Iris Lan, David O'Neil, Katherine Polk Failla, Celeste L. Koeleveld, Assistant United States Attorneys, *of counsel*), United States Attorney's Office for the Southern District of New York, New York, NY, *for Appellee United States of America.*
>
> JAMES E. NEUMAN, New York, NY, *for Defendant-Appellant Mohamed Sadeek Odeh.*
>
> FREDERICK H. COHN, New York, NY, *for Defendant-Appellant Mohamed Rashed Daoud Al-'Owhali.*
>
> JOSHUA L. DRATEL and SAM A. SCHMIDT (Erik B. Levin, Renita K. Thukral, Meredith S. Heller, *of counsel*), New York, NY, *for Defendant-Appellant Wadih El Hage.*

JOSÉ A. CABRANES, *Circuit Judge*:

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.    Al-'Owhali's Challenge to the Sufficiency of the Indictment . . . . . . . . . . . . . . . . . . . . 14

        B.    El-Hage's and Odeh's Challenges to the Sufficiency of the Evidence . . . . . . . . . . . . . 20

        C.    El-Hage's Challenge to the District Court's Application of the
            Classified Information Procedures Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        D.    El-Hage's Motion To Sever His Trial from That of His Co-Defendants . . . . . . . . . . . 49

        E.    The Admission of Certain Statements of El-Hage's Co-Defendants,
            Co-Conspirators, and Other Third Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

        F.    El-Hage's Motion for a New Trial Based on the Post-Conviction Disclosure of
            Recorded Statements of a Government Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

        G.    El-Hage's Claim under the Cumulative Error Doctrine . . . . . . . . . . . . . . . . . . . . . . . 74

        H.    El-Hage's Challenge to the Sentence Imposed by the District Court . . . . . . . . . . . . . 82

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

**INTRODUCTION**

On May 29, 2001, a jury of the United States District Court for the Southern District of New York returned verdicts of guilt against defendants-appellants Mohamed Sadeek Odeh, Mohamed Rashed Daoud Al-'Owhali, and Wadih El-Hage as to numerous charges arising from their involvement in the August 7, 1998 bombings of the American Embassies in Nairobi, Kenya and Dar es Salaam,

Tanzania (the "August 7 bombings").[1]  The jury considered, but declined to impose, the death penalty on defendant-appellant Al-'Owhali.  Between October 22 and October 24, 2001, the District Court[2] (Leonard B. Sand, *Judge*) entered judgments of conviction against all three defendants and sentenced each of them to life imprisonment.   Defendants are currently incarcerated and serving their sentences. All three now appeal their convictions, and El-Hage also appeals (1) the sentence imposed upon him by Judge Sand, (2) an order entered on November 2, 2005 by Judge Kevin Thomas Duffy, denying his motion for a new trial pursuant to Federal Rule of Criminal Procedure 33, and (3) an order entered on December 5, 2005 by Judge Duffy, denying El-Hage's motion for reconsideration of the November 2 order.

This criminal case presents issues of great importance, many of which are complex and novel; consequently, this case has been in the federal courts for a decade.  This case commenced in late 1998, when defendants were indicted for their participation in the August 7, 1998 bombings of American Embassies in Kenya and Tanzania—acts of terrorism that resulted in the deaths of over 200 people. Jury selection began in early 2001, and trial commenced in February of that year.  The trial lasted nearly four months and concluded on May 29, 2001 when the jury reached unanimous verdicts of defendants' guilt.  In October 2001, the District Court imposed a sentence of life imprisonment on all defendants, judgment was entered, and defendants then filed timely appeals.[3]  For the reasons described in greater

---

[1] Also convicted was defendant Khalfan Khamis Mohamed, who initially appealed his conviction but later withdrew that appeal.  Also indicted, but not tried, were Osama Bin Laden, Fazul Abdullah Mohammed, Muhammad Atef, Mustafa Mohamed Fadhil, Ahmed Khalfan Ghailani, Fahid Mohammed Msalam, Mamdouh Mahmud Salim, Ali Mohamed, Ayman al Zawahiri, Khaled al Fawwaz, Ibrahim Eidarous, Adel Abdel Bary, Saif al Adel, Abdullah Ahmed Abdullah, Muhsin Musa Matwalli Atwah, Anas al Liby, L'Houssiane Kherchtou, and Mohamed Suleiman al Nalfi.

[2] Judge Sand presided over appellants' pretrial proceedings, trial, and certain post-trial proceedings.  On January 23, 2002, this matter was reassigned to United States District Judge Kevin Thomas Duffy, who presided over additional post-trial proceedings.

[3] The case also involved lengthy pretrial and post-trial proceedings.  Defendants filed extensive pretrial motions urging, *inter alia*, the severance of their trials, the dismissal of the indictments, the suppression of both physical evidence seized overseas and certain inculpatory statements, and release on bail.  The District Court denied most of defendants' pretrial motions, including the application for bail—a decision which was appealed by one of the defendants

detail below, as well as those set forth in *In re Terrorist Bombings of U.S. Embassies in East Africa (Fourth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008), and *In re Terrorist Bombings of U.S. Embassies in East Africa (Fifth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008), both filed today, we conclude that none of the issues raised on appeal has merit, with the exception of El-Hage's challenge to his sentence on the basis of the District Court's mandatory application of the United States Sentencing Guidelines based on then-binding Circuit precedent. We therefore affirm the judgments of conviction entered by the District Court against Al-'Owhali, El-Hage, and Odeh, and we remand the case to the District Court solely for the purpose of resentencing El-Hage.

In reaching this conclusion, we hold that (1) the indictment under which Al-'Owhali proceeded to trial sufficiently alleged the "gateway considerations" rendering Al-'Owhali death-eligible pursuant to *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000); (2) the evidence presented at trial by the government was sufficient to support (a) El-Hage's conspiracy convictions and (b) Odeh's convictions for the conspiracy and substantive offenses with which he was charged; (3) pursuant to the Classified Information Procedures Act, 18 U.S.C. app. 3, the District Court was authorized to restrict access to classified information only to those with a security clearance, and its decision to do so here did not violate El-Hage's Sixth Amendment right to counsel, his Fifth and Sixth Amendment rights to present a defense, or his Fifth and Sixth Amendment rights to be present during a crucial stage in his trial; (4) the District Court did not err in denying El-Hage's motion to sever his

---

and affirmed by this Court in early 2000. *See United States v. El-Hage*, 213 F.3d 74 (2d Cir. 2000).

In October 2003, the defendants moved, in the District Court, for a new trial based on newly disclosed evidence. *See United States v. Bin Laden*, 397 F. Supp. 2d 465, 473 (S.D.N.Y. 2005). The District Court conducted evidentiary hearings on this motion, and we held the appeals in abeyance pending the District Court's resolution of the motion. In November 2005, the District Court denied the motion for a new trial. *Id.*

After granting requests by defendants to consolidate the appeals from the District Court's post-conviction rulings and for extensions of time to complete their briefs, we heard this case on December 10, 2007.

5

trial from that of his co-defendants; (5) the statements of defendants' co-conspirators were properly admitted at trial; (6) defendants were not prejudiced by the government's post-trial disclosure of transcripts of video-conferences with a key witness for the government; (7) because we perceive no error at trial, there is no merit in El-Hage's suggestion that "cumulative error" deprived him of a fair trial; (8) the application of certain enhancements to El-Hage's sentencing guidelines calculation was not error; and (9) insofar as El-Hage's sentence resulted from the mandatory application of the United States Sentencing Guidelines, we remand his case for resentencing pursuant to *United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005).

## I. BACKGROUND

We provide an outline of the factual and procedural history of this case below. Insofar as our evaluation of the claims raised by defendants requires additional detail from the record, we have provided that information in the relevant section of this opinion and in *In re Terrorist Bombings of U.S. Embassies in East Africa (Fourth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008), and *In re Terrorist Bombings of U.S. Embassies in East Africa (Fifth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008).

## A. Factual Overview[4]

In 1996, the United States Attorney for the Southern District of New York convened a grand jury to investigate the involvement of Osama Bin Laden and the al Qaeda organization in international terrorism directed at U.S. nationals, other "internationally protected persons,"[5] and U.S. interests. *See*

---

[4] On appeal from judgments of conviction, "we view the evidence in the light most favorable to the [g]overnment." *United States v. Yousef*, 327 F.3d 56, 78 (2d Cir. 2003) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[5] Pursuant to 18 U.S.C. § 1116(b)(4), "Internationally protected persons" include:

   (A) a Chief of State or the political equivalent, head of government, or Foreign Minister whenever such person is in a country other than his own and any member of his family accompanying him; or

   (B) any other representative, officer, employee, or agent of the United States Government, a foreign government, or international organization who at the time and place concerned is entitled pursuant to international law to special protection against attack upon his person, freedom, or dignity, and any member of

6

*United States v. Bin Laden*, 126 F. Supp. 2d 264, 268-69 (S.D.N.Y. 2000). Bin Laden came to the attention of the U.S. government as early as 1992 when the U.S. Department of State determined that he had provided financing to Yemeni terrorists who were attempting to murder U.S. troops in Yemen. *See* The National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* 108-09 (2004). In 1993, the Central Intelligence Agency ("CIA") determined that Bin Laden had "paid for the training of some Egyptian terrorists in Sudan," *id.* at 108, and the State Department added Bin Laden to its list of known and suspected terrorists that same year, *id.* at 109, 83. By 1996, the CIA had linked Bin Laden to the al Qaeda organization. *Id.* at 109. U.S. intelligence experienced a "breakthrough" in the mid-1990s when a former aide to Bin Laden explained the "creation, character, direction, and intentions" of al Qaeda. *Id.* Around that time, U.S. intelligence officials also became aware that al Qaeda had a presence in Nairobi, Kenya; individuals associated with al Qaeda were using particular phone numbers to communicate with Bin Laden and with each other; and defendant El-Hage was one of those individuals. *Bin Laden*, 126 F. Supp. 2d at 269.

El-Hage, a naturalized U.S. citizen, was a close associate of Bin Laden and served as the head of the Nairobi al Qaeda cell during a period post-dating Bin Laden's 1996 public declaration of holy war against America through the time of the embassy bombings. Tr. 1210-11, 1251-52.[6] He had financial and personnel responsibilities for Bin Laden's enterprises. Tr. 258-59, 908-12. In February 1997, he conveyed a message from Bin Laden directing the Nairobi cell to prepare for military activity. Two months later, the Attorney General of the United States authorized officials to collect intelligence targeting El-Hage.

---

his family then forming part of his household.

[6] "Tr." refers to the trial transcript.

In September 1997, El-Hage flew to the United States from Nairobi. Shortly thereafter, he was subpoenaed to testify before the grand jury investigating al Qaeda. After taking an oath to testify truthfully, El-Hage made numerous false statements about the last time he had seen Bin Laden, the nature of his contacts with various Bin Laden associates, and his awareness of Bin Laden's plans to target American interests. He was arrested shortly after testifying. *See United States v. Bin Laden*, 91 F. Supp. 2d 600, 606 (S.D.N.Y. 2000).

On August 7, 1998, at approximately 10:30 a.m., al Qaeda operatives detonated truck bombs outside the American Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, killing 224 people—including twelve Americans—and wounding thousands more.

The day before the explosions in Kenya and Tanzania, defendant Odeh—an al Qaeda member based in Nairobi[7]—took a late night flight from Nairobi to Karachi, Pakistan. Tr. 1685-87. Early the next morning, Pakistani officials arrested Odeh at the airport after determining that he lacked proper travel documents. Tr. 3584-86, 3794. Forensic analysis revealed explosives residue on his clothing and other items contained in his luggage. Tr. 3780-82. A search of Odeh's Nairobi residence on or around August 8, 1998 revealed sketches of the area surrounding the American Embassy and the bomb placement site, and a budget sheet that included entries for "weapons and artilleries" as well as items needed for "training . . . at the camp." Supplemental App. 2284, 2286, 2291. On August 14, 1998, Pakistani authorities transported Odeh back to Kenya, where he was taken into custody by Kenyan officials. Tr. 3795. Between August 15 and August 27, Odeh was questioned in Kenya by American and Kenyan officials. Tr. 1617-18. During these sessions, he admitted, *inter alia*, to his membership in al Qaeda and his training in explosives. Tr. 1631, 1640, 1626-27. This evidence was produced at trial

---

[7] Odeh joined al Qaeda in 1992 and received instruction in the use of explosives and small arms in a training camp in Afghanistan. Tr. 1631, 1640, 1626-27. He worked for al Qaeda in Somalia in 1993 and then moved to Kenya later that year, as al Qaeda was establishing its operations there. Tr. 1648-52. At the time of the bombings, Odeh worked with the Nairobi cell of al Qaeda. Tr. 1657-58.

to establish that Odeh was the "technical adviser [for] the embassy bombings," who instructed the Nairobi cell "about how best to build and place the bomb so as to cause maximum American fatalities."

Defendant Al-'Owhali, an al Qaeda operative who helped to place the bomb that exploded outside the American Embassy in Nairobi, left the truck shortly before the bomb detonated and was seen fleeing the scene by an eyewitness. Tr. 5137. On August 12, 1998, he was arrested in Kenya by Kenyan authorities acting in concert with U.S. law enforcement agents. *See United States v. Bin Laden*, 132 F. Supp. 2d 168, 173 (S.D.N.Y. 2001). Between August 12 and August 25, 1998, Al-'Owhali remained in Kenyan custody but was periodically interviewed by American agents. *Id.* at 174. On August 26, 1998, he was transported to the United States for further interviews. *Id.* at 178.

**B.     Procedural History**

In an indictment filed in the District Court on September 21, 1998, El-Hage was charged with several counts of perjury and making false statements. *See Bin Laden*, 91 F. Supp. 2d at 606. On October 7, 1998, the indictment charging him with these offenses was superseded by an indictment that added charges directly related to the August 7, 1998 embassy bombings and included Odeh and Al-'Owhali as additional defendants. *Id.* Several more superseding indictments were subsequently filed, bringing the total number of named defendants to fifteen. *Id.* The indictment on which defendants-appellants ultimately proceeded to trial ("the Indictment") was filed on May 8, 2000. It charged all of the defendants with 267 discrete criminal offenses, including participation in conspiracies (1) to murder United States nationals, United States military personnel stationed in Somalia and Saudi Arabia, United States nationals and other "internationally protected persons" employed at the United States Embassies in Kenya and Tanzania; and (2) to conceal the activities of the conspiracy. *See Bin Laden*, 91 F. Supp. 2d at 606; *Bin Laden*, 92 F. Supp. 2d at 228. Certain of the defendants were also

9

charged with murder and other substantive offenses, and El-Hage was also charged with perjury and making false statements. *Id.*

Pursuant to the procedures set forth in the United States Attorneys' Manual §§ 9-10.020 to 9-10.080, the government provided notice on June 28, 2000 that it was planning to seek the imposition of the death penalty against Al-'Owhali and another co-defendant. *See United States v. Bin Laden*, 109 F. Supp. 2d 211, 213 (S.D.N.Y. 2000). El-Hage and two of his co-defendants then moved to sever their trial from that of certain other co-defendants on the basis that (1) unlike the other co-defendants, they were not charged with any substantive offenses arising from the August 7 bombings, and (2) unlike Al-'Owhali, they were not on trial for capital crimes. *See Bin Laden*, 109 F. Supp. 2d at 217, 221. The District Court denied this motion. *Id.* at 223. In October 2000, Al-'Owhali moved to challenge the sufficiency of the indictment with respect to those charges carrying a capital penalty, and this motion was also denied by the District Court. *See United States v. Bin Laden*, 126 F. Supp. 2d 290, 296 & n.6 (S.D.N.Y. 2001).

In addition, all three defendants-appellants filed motions to suppress certain evidence. El-Hage filed a motion to suppress evidence obtained from an August 1997 search of his residence in Nairobi, as well as the surveillance, from August 1996 to August 1997, of four telephone lines in Nairobi. This motion was denied by the District Court.[8] *See United States v. Bin Laden*, 126 F. Supp. 2d 264, 288 (S.D.N.Y. 2001).

Al-'Owhali filed a motion to suppress statements he made to U.S. agents during interviews conducted in Kenya. The District Court, having initially granted this motion, subsequently reopened the matter upon motion of the government. *See United States v. Bin Laden*, 132 F. Supp. 2d 168, 172 (S.D.N.Y. 2001). After permitting the government to further develop the record, the District Court

---

[8] El-Hage's challenge to the District Court's denial of this motion is addressed in *In re Terrorist Bombings of U.S. Embassies in East Africa (Fourth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008).

withdrew its previous decision and substituted an opinion granting Al-'Owhali's motion as to statements made before August 22, 1997, *see id.* at 192, 198, and denying the motion as to statements made from August 22 onwards, *see id.* at 194.[9]

In June 2000, Odeh's attorneys submitted a motion to suppress statements that Odeh had made to Pakistani authorities in Pakistan and to U.S. authorities in Kenya. *See United States v. Bin Laden*, 132 F. Supp. 2d 198, 201 (S.D.N.Y. 2001). Several days later, however, Odeh notified the District Court that he wished to withdraw this motion on religious grounds.[10] *Id.* at 201 & n.3. The District Court, after holding an *ex parte* hearing with Odeh and his counsel, *id.* at 201, entered an order on August 1, 2000, deeming Odeh's motion to have been withdrawn without prejudice. *Id.* Jury selection for the trial began on January 3, 2001. *Id.* On January 9, 2001, the District Court issued its initial—and later withdrawn—decision granting Al-'Owhali's motion to suppress in full. *Id.* at 201 & n.5 Odeh's attorneys then filed motions to suppress the statements Odeh made to Pakistani authorities in Pakistan and to U.S. authorities in Kenya. *Id.* The District Court denied the first motion (which renewed Odeh's withdrawn June 2000 motion) as untimely, *id.* at 215, and the second motion on the merits, after an evidentiary hearing, *see id.* at 212-13.[11]

---

[9] Al-'Owhali's challenge to the District Court's partial denial of this motion is addressed in *In re Terrorist Bombings of U.S. Embassies in East Africa (Fifth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008).

[10] Specifically, Odeh, in an undated letter, stated: "I refuse to submit a petition or a complaint as to what occurred during that period of time [*i.e.*, his detention in Pakistan and Kenya] for merely Sharia (religious) reasons . . . . Therefore, I withdraw this form of mine [his affidavit]." Appellants' App. 2738. In a letter dated July 20, 2000 and signed by all four members of Odeh's legal team, defense counsel took the position that "[t]he court should permit the withdrawal of Mr. Odeh's affidavit to accommodate his religious beliefs[ ] but conduct a hearing to ensure that Mr. Odeh's constitutional rights are protected and that justice is served." *Id.* at 2734. The government and Odeh provide differing accounts of the religious basis for Odeh's decision to withdraw his affidavit. The government contends that Odeh's "hesitations stemmed in part from the falsity of the facts to which he was asked to swear 'in the name of God.'" Appellee's Br. 366. Odeh asserts that "certain tenets of Islam prevented him from 'complaining' about the actions of others, in a sworn statement, to a non-Islamic court." Odeh Br. 46. We endorse neither view.

[11] Odeh's challenge to the District Court's denial of these motions is addressed in *In re Terrorist Bombings of U.S. Embassies in East Africa (Fifth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008).

The jury trial began on February 5, 2001. After the close of the government's case, defendants moved pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure to dismiss the charges against them on the basis of the insufficiency of the evidence. On April 12, 2001, the District Court granted in part the Rule 29(a) motions of Odeh and Al-'Owhali with respect to the charged substantive offenses arising from the American Embassy bombing in Tanzania (Counts 6 and 8). On May 29, 2001, the jury convicted defendants of all remaining counts.

All three defendants-appellants were convicted of: conspiracy to murder United States nationals in violation of 18 U.S.C. § 2332(b) (Count 1); conspiracy to murder internationally protected persons, United States officers, and employees engaging in official duties in violation of 18 U.S.C. § 1117 (Count 2); and conspiracy to destroy buildings and property of the United States in violation of 18 U.S.C. § 844(n) (Count 4). In addition, Odeh and Al-'Owhali were convicted of conspiracy to use weapons of mass destruction against United States nationals and property overseas in violation of 18 U.S.C. § 2332a(a)(1) & (3) (Count 3).[12]

Odeh and Al-'Owhali were also convicted of the following substantive capital offenses: causing death by bombing the American Embassy in Nairobi in violation of 18 U.S.C. §§ 844(f)(3) (Count 5); use of a weapon of mass destruction for bombing the American Embassy in Nairobi in violation of 18

---

[12] For the purposes of this provision, a "weapon of mass destruction" is defined as follows:

(A) any destructive device as defined in section 921 of this title [listing "explosive, incendiary, or poison gas" devices and weapons, other than shotguns, "which ha[ve] . . . barrel[s] with a bore of more than one-half inch in diameter"];

(B) any weapon that is designed or intended to cause death or serious bodily injury through the release, dissemination, or impact of toxic or poisonous chemicals, or their precursors;

(C) any weapon involving a biological agent, toxin, or vector (as those terms are defined in section 178 of this title); or

(D) any weapon that is designed to release radiation or radioactivity at a level dangerous to human life.

18 U.S.C. § 2332a(c)(2).

12

U.S.C. § 2332a(a)(1) & (3) with death resulting (Count 7); murder of 133 individuals in the course of an attack on a U.S. facility in Nairobi, in violation of 18 U.S.C. § 930(c) (Counts 9-221); murder of U.S. officers and employees in Nairobi in violation of 18 U.S.C. § 1114 (Counts 233-73); and murder of internationally protected persons in violation of 18 U.S.C. § 1116 (Counts 278-79). In addition, they were convicted of the following non-capital offenses: attempted murder of officers and employees of the American Embassy in Nairobi in violation of 18 U.S.C. §§ 1114 (Count 274); attempted murder of internationally protected persons in violation of 18 U.S.C. § 1116 (Count 280); using and carrying an explosive during commission of a felony in violation of 18 U.S.C. §§ 844(h) (Count 282); and using and carrying an explosive device during a crime of violence, in violation of 18 U.S.C. § 924(c) (Count 283).

El-Hage was also convicted of multiple counts of perjury before a grand jury in violation of 18 U.S.C. § 1623 (Counts 285-302).

The death-penalty phase of the trial then commenced. On June 12, 2001, the jury reported to the District Court that it declined to impose a sentence of death on Al-'Owhali, the only defendant-appellant against whom the death penalty was sought.

Following the trial, El-Hage and Al-'Owhali moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure or, in the alternative, a new trial pursuant to Rule 33. The motions were denied. *See United States v. Bin Laden*, No. 98 Cr. 1023, 2001 WL 1160604 (S.D.N.Y. Oct. 2, 2001).

In October 2001, the District Court imposed, *inter alia*, imprisonment for a term of life on all three defendants. Judgments of conviction were entered against El-Hage, Al-'Owhali, and Odeh on October 22, 2001; October 23, 2001; and October 24, 2001, respectively.

Two years later, in October 2003, El-Hage moved again for a new trial pursuant to Rule 33 based, in part, on the government's post-trial disclosure of videotapes depicting pretrial interviews with

13

one of the government's main witnesses. *See United States v. Bin Laden*, No. 98 Cr. 1023, 2005 WL 287404, at *8-9 (S.D.N.Y. Feb. 7, 2005). Al-'Owhali and Odeh joined in El-Hage's motion. *Id.* at *1 n.2. The District Court, after holding a series of evidentiary hearings on this matter, denied El-Hage's motion in an opinion and order of November 2, 2005. *United States v. Bin Laden*, 397 F. Supp. 2d 465 (S.D.N.Y. 2005). El-Hage moved for reconsideration on November 16. The District Court denied this motion in an order entered on December 5, 2005.

Defendants-appellants now appeal from the judgments of conviction and the post-trial orders.

## II. DISCUSSION

In this opinion we consider defendants' arguments that their convictions should be vacated because (1) the indictment was not sufficient to support a conviction of a capital offense; (2) insufficient evidence supported the convictions; (3) the District Court's application of the Classified Information Procedures Act violated one defendant's constitutional rights; (4) a severance motion should have been granted; (5) statements attributed to other members of the conspiracy should not have been admitted; (6) the government withheld exculpatory evidence; (7) cumulative error resulted in the deprivation of a fair trial; (8) certain sentencing enhancements were improper; and (9) the mandatory application of the Sentencing Guidelines warrants a remand of one defendant's case for resentencing.

For the reasons described below, we perceive no basis to disturb the judgments of conviction entered against each of the defendants. With respect to El-Hage, however, resentencing pursuant to *United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005), is warranted.

## A. Al-'Owhali's Challenge to the Sufficiency of the Indictment

Al-'Owhali argues for the reversal of his capital convictions because the government sought the death penalty against him for capital offenses based on an indictment that, Al-'Owhali contends, did

14

not adequately allege the circumstances that rendered him eligible for the death penalty. Relying on the Fifth Amendment's guarantee that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury," Al-'Owhali argues that he was "denied his right to be tried only on charges presented in the indictment returned by the grand jury, mandating reversal, regardless of prejudice," *see* Al-'Owhali Br. 47, 51. The government, in response, contends that the Indictment sufficiently alleged the "gateway factors"[13] rendering Al-'Owhali death-eligible. Appellee Br. 468. In the alternative, the government contends that, even if the Indictment was defective, Al-'Owhali's conviction was free from prejudicial error because the jury declined to impose a sentence of death. *Id.* at 483.

Nearly two months after the superseding indictment was filed, the government filed a "Notice of Intent" declaring its intention to seek the death penalty against Al-'Owhali. Al-'Owhali then moved to dismiss the government's "Notice of Intent" on October 2, 2000, contending, *inter alia*, that the May 8 indictment did not adequately charge "the intent factors and statutory aggravating factors" rendering him death-eligible, as required under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Jones v. United States*, 526 U.S. 227 (1999). The District Court, in an opinion issued on January 2, 2001, rejected this claim upon concluding that "in federal capital cases, gateway mental states and aggravators are not required to be contained in the indictment." *United States v. Bin Laden*, 126 F. Supp. 2d 290, 296 n.6 (S.D.N.Y. 2001).

At the conclusion of Al-'Owhali's trial, the jury found that the government had proved beyond a reasonable doubt the factors necessary to render Al-'Owhali "death-eligible." However, the jury

---

[13] "Gateway factors" are statutorily defined aggravating factors, such as the commission of multiple killings or the selection of particularly vulnerable victims, one of which must be found unanimously by a jury before that jury can consider imposing a sentence of death. *See United States v. Fell*, 360 F.3d 135, 140 (2d Cir. 2004) ("During this separate hearing, referred to as the sentencing or penalty phase, the jury first considers whether the government has sustained its burden of proving the existence of one or more statutorily defined aggravating factors beyond a reasonable doubt." (citing 18 U.S.C. § 3593(c))).

15

declined to impose the death penalty upon him in favor of "life imprisonment without the possibility of release." The District Court entered a judgment of conviction sentencing Al-'Owhali principally to life imprisonment on October 24, 2001.

On June 24, 2002, the Supreme Court held, in *Ring v. Arizona*, that an aggravating factor rendering a defendant death-eligible is "the functional equivalent of an element of a greater offense." 536 U.S. 584, 609 (2002) (quoting *Apprendi*, 530 U.S. at 494 n.19 (concluding that such elements must be found by a jury)). In light of the Supreme Court's previous determination that "any fact . . . increas[ing] the maximum penalty for a crime must be charged in an indictment," *Apprendi*, 530 U.S. at 476 (quoting *Jones*, 526 U.S. at 243 n.6), *Ring* establishes that, when the government seeks a sentence of death, the gateway mental factors and statutory aggravating factors rendering the defendant death-eligible must "be alleged in the indictment and found by a jury," *United States v. Quinones*, 313 F.3d 49, 53 n.1 (2d Cir. 2002).

Because *Ring* was decided while Al-'Owhali was awaiting direct review of his conviction, the rule set forth in *Ring* applies equally to Al-'Owhali's case. *See, e.g.*, *Griffith v. Kentucky*, 479 U.S. 314, 322-23 (1987) (noting that, when the Supreme Court decides a new constitutional rule, "the integrity of judicial review requires that . . . [this] rule [be applied] to all similar cases pending on direct review"). Accordingly, we turn to the question of whether the indictment by which Al-'Owhali was charged with capital offenses adequately set forth the requisite intent and the statutory aggravating factors rendering him death-eligible.

To establish Al-'Owhali's death-eligibility, the government was required to charge that Al-'Owhali had acted with the requisite intent under circumstances establishing the existence of one or more statutory aggravating factors. *See* 18 U.S.C. § 3591(a)(2); *id.* § 3593(e); *see also Jones*, 527 U.S. at 376-77. The Federal Death Penalty Act, codified at 18 U.S.C. §§ 3591-3598, provides that a defendant

16

charged with a homicide offense possessed the requisite *mens rea* for imposition of the death penalty if

he:

(A)     intentionally killed the victim;

(B)     intentionally inflicted serious bodily injury that resulted in the death of the victim;

(C)     intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or

(D)     intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

18 U.S.C. § 3591(a)(2).  The statutory aggravating factors for a homicide offense include: causing death

during the commission of a qualifying crime,[14] *id.* § 3592(c)(1); "knowingly creat[ing] a grave risk of

death to [one] or more persons in addition to the victim of the offense," *id.* § 3592(c)(5); "committ[ing]

the offense after substantial planning and premeditation to cause the death of a person or commit an

act of terrorism," *id.* § 3592(c)(9); and "intentionally kill[ing] or attempt[ing] to kill more than one

person in a single criminal episode," *id.* § 3592(c)(16).

The government sought the death penalty against Al-'Owhali for the following offenses:

causing death by bombing the American Embassy in Nairobi, in violation of 18 U.S.C. § 844(f) (Count

5);  use of weapons of mass destruction against U.S. nationals overseas, in violation of 18 U.S.C.

§ 2332a(a)(1) & (3) (Count 7); murder in the course of an attack on a U.S. facility, in violation of 18

U.S.C. § 930(c) (Counts 9-221); murder of U.S. officers and employees, in violation of 18 U.S.C. § 1114

---

[14] The qualifying crimes set forth in 18 U.S.C. § 3592(c)(1) include "commission or attempted commission of, or during the immediate flight from the commission of, an offense under . . . section 844(f) (destruction of government property by explosives), . . . section 1116 (killing or attempted killing of [foreign] diplomats), section 1203 (hostage taking), . . . [and] section 2332a (use of weapons of mass destruction)."

17

(Counts 233-73); and murder of internationally protected persons, in violation of 18 U.S.C. § 1116

(Counts 278-79).

Count Five of the indictment charged Al-'Owhali with having "wilfully[ ] and knowingly . . .

detonated an explosive device that damaged and destroyed the United States Embassy in Nairobi,

Kenya, and as a result of such conduct directly and proximately caused the deaths of at least 213

persons." Count Seven of the indictment charged that he

> unlawfully, wilfully, [and] knowingly . . . use[d] a weapon of mass destruction against nationals of the United States . . . and against property that was owned, leased and used by the United States[;] . . . to wit . . . attacked the American [E]mbassy in Nairobi, Kenya, and employees of the American Government stationed at this [E]mbassy with a bomb, which use of such weapon of mass destruction resulted in death.

These statements plainly allege the existence of at least two statutory aggravating factors: causing death

during the commission of a qualifying crime, 18 U.S.C. § 3592(c)(1), and intentionally killing more than

one person in a single criminal episode, *id.* § 3592(c)(16). They also clearly allege that Al-'Owhali

committed the charged crimes with the requisite intent—namely, that he knowingly engaged in an act

of violence with the knowledge that the act created a risk of death, *id.* § 3591(a)(2)(D). *Cf. United States*

*v. Temple*, 447 F.3d 130, 137 (2d Cir. 2006) (noting that "'[w]illful' repeatedly has been defined in the

criminal context as intentional, purposeful, and voluntary, as distinguished from accidental or

negligent"). Accordingly, we conclude that the indictment adequately set forth the factors that the

government was required to prove as to Counts Five and Seven.

The principal allegations supporting Counts Nine through 221 read as follows:

> [Al-'Owhali and certain co-defendants] wilfully, deliberately, and maliciously, . . . with malice aforethought and with premeditation, did kill . . . persons . . . during the course of an attack on a federal facility involving the use of a dangerous weapon, to wit, the defendants detonated an explosive device that damaged and destroyed the United States Embassy in Nairobi, Kenya, and as a result of such conduct directly and proximately caused the deaths of [213 named persons.]

18

Counts 233 through 273 charge that Al-'Owhali and certain co-defendants "wilfully, deliberately, and maliciously, . . . with malice aforethought and with premeditation, did murder officers and employees of the United States Government[;] . . . [n]amely, the defendants caused the deaths of [41 named persons] by bombing the United States Embassy in Nairobi, Kenya." Finally, Counts 278 and 279 allege that Al-'Owhali and certain other co-defendants "wilfully, deliberately, and maliciously, . . . with malice aforethought and with premeditation, did murder representatives, officers, employees and agents of the United States Government[;] . . . namely[,] . . . caused the deaths of [2 named] persons by bombing the United States Embassy in Nairobi, Kenya."

Each of these allegations clearly sets forth the existence of at least three statutory aggravating factors—causing death during the commission of a qualifying crime, 18 U.S.C. § 3592(c)(1), committing an offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism, *id.* § 3592(c)(9), and intentionally killing more than one person in a single criminal episode, *id.* § 3592(c)(16). Each also clearly alleges that Al-'Owhali committed the charged crime with the requisite intent. *See also* Black's Law Dictionary 977 (8th ed. 2004) (noting that the concept of malice aforethought "encompass[es] . . . (1) the intent to kill[ ] [and] (2) the intent to inflict grievous bodily harm"); 18 U.S.C. § 3591(a)(2)(A) (intent to kill) & (B) (intent to inflict bodily harm). We reject Al-'Owhali's contention that the indictment must specifically cite the statutory provisions for the "gateway" factors, especially where, as here, the allegations set forth in the indictment were sufficient to satisfy the rule of *Ring* and *Apprendi*. Accordingly, we conclude that, with respect to the capital charges, the indictment adequately set forth the factors that the government was required to prove.[15]

---

[15] Because we conclude that the indictment under which Al-'Owhali proceeded to trial sufficiently alleged the gateway considerations that rendered Al-'Owhali death-eligible, we need not consider the government's argument in the alternative that "the failure of a pre-*Ring* indictment to allege *mens rea* and statutory aggravating factors constitutes harmless error," Appellee's Br. 481-83, or Al-'Owhali's contention that no prejudice need be shown when the indictment

**B.      El-Hage's and Odeh's Challenges to the Sufficiency of the Evidence**

El-Hage and Odeh challenge the sufficiency of the government's evidence against them.  El-Hage contends that the government did not present sufficient evidence to support his conspiracy convictions.  Odeh challenges the sufficiency of the evidence with respect to all of his crimes of conviction.

A defendant challenging the sufficiency of the evidence supporting his criminal conviction bears "'a heavy burden.'"  *United States v. Tran*, 519 F.3d 98, 105 (2d Cir. 2008) (quoting *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004)).  When presented with a sufficiency-of-the-evidence challenge, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Carlo*, 507 F.3d 799, 801 (2d Cir. 2007) ("On an appeal challenging the sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor."); *Yousef*, 327 F.3d at 134 (noting that we "will not disturb [a jury] verdict if there is substantial evidence to support it").  Accordingly,

> [a] conviction may be sustained on the basis of the testimony of a single [witness], so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.  Any lack of corroboration goes to the weight of the evidence, not to its sufficiency, and a challenge to the weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal.

*United States v. Gordon*, 987 F.2d 902, 906 (2d Cir. 1993) (internal citations omitted).  We now review each defendant's challenge in turn.

---

does not contain charges on which he was convicted, Al-'Owhali Br. 51.

20

1.    El-Hage

Following trial, El-Hage moved for a judgment of acquittal on all counts on which he was convicted, pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure.[16] The District Court rejected El-Hage's motion in all respects. *See United States v. Bin Laden*, No. 98 Cr. 1023, 2001 WL 1160604, at *1 (S.D.N.Y. Oct. 2, 2001). On appeal, El-Hage limits his sufficiency challenges to the conspiracy convictions,[17] alleging that the government failed to present any evidence establishing that he knew about these conspiracies, much less intended to participate in them. Specifically, he argues that his alleged perjury cannot establish that he was a member of the charged conspiracies.

We review the District Court's denial of a Rule 29(c) motion *de novo*. *See, e.g.*, *United States v. Ebbers*, 458 F.3d 110, 125 (2d Cir. 2006). To establish the existence of a criminal conspiracy, the government must prove that the conspirators agreed "on the 'essence of the underlying illegal objective[s],' and the 'kind of criminal conduct . . . in fact contemplated.'" *United States v. Salameh*, 152 F.3d 88, 151 (2d Cir. 1998) (quoting *United States v. Stavroulakis*, 952 F.2d 686, 690 (2d Cir. 1992) (citations omitted)). "[T]he government need not present evidence of an explicit agreement; proof of a tacit understanding will suffice." *Gordon*, 987 F.2d at 906 (internal quotation marks omitted). "[T]he evidence necessary to link a particular defendant to [a criminal] scheme . . . may be circumstantial in nature." *Gaskin*, 364 F.3d at 460. "A defendant's knowing and willing participation in a conspiracy may be inferred from . . . her presence at critical stages of the conspiracy that could not be explained by happenstance, or a lack of surprise when discussing the conspiracy with others." *United States v.*

_____

[16] Rule 29(c) permits a defendant to "move for a judgment of acquittal, or renew such a motion, within seven days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Cr. P. 29(c)(1).

[17] As noted above, the jury found El-Hage guilty of: conspiracy to kill United States nationals in violation of 18 U.S.C. § 2332(b) (Count 1); conspiracy to murder internationally protected persons, United States officers, and employees engaging in official duties, in violation of 18 U.S.C. § 1117 (Count 2); and conspiracy to destroy buildings and property of the United States, in violation of 18 U.S.C. § 844(n) (Count 4). El-Hage was also convicted of multiple counts of perjury before a grand jury (Counts 285-302).

*Aleskerova*, 300 F.3d 286, 293 (2d Cir. 2002) (internal citations omitted). It may also be established by "evidence that the defendant participated in conversations directly related to the substance of the conspiracy[,] possessed items important to the conspiracy," *id.*, or engaged in acts "exhibit[ing] a consciousness of guilt, such as [making] false exculpatory statements," *Gordon*, 987 F.2d at 907 (citations omitted). We have observed that "[w]here conspirators are charged with pursuing multiple criminal objectives, the government is not required to prove that the defendant agreed to all of the objectives. Rather, the government must show that the defendant shared 'some knowledge of the conspiracy's unlawful aims and objectives.'" *Salameh*, 152 F.3d at 151 (quoting *United States v. Heinemann*, 801 F.2d 86, 93 (2d Cir. 1986)) (internal brackets and citation omitted); *accord Stavroulakis,* 952 F.2d at 690 ("The policies underlying conspiratorial liability could easily be thwarted by the careful compartmentalization of information, and 'conspirators would go free by their very ingenuity,' if it were required that they agree on all details of the scheme." (quoting *Blumenthal v. United States*, 332 U.S. 539, 557 (1947))).

At trial, the government offered evidence—including physical documents and testimony from other al Qaeda members—to establish that El-Hage: (1) had been present at private meetings where Bin Laden and other al Qaeda officials discussed their program of attacks against the United States, Tr. 259-70, 280-81, 517-18, 960-62; (2) served as a financial controller or "paymaster" of sorts for Bin Laden's enterprises—a position that involved reviewing al Qaeda personnel files to ascertain which Bin Laden employees were to receive extra pay for their work pursuing activities on al Qaeda's behalf, Tr. 258-59, 908-12; (3) played a key role in procuring fraudulent travel documents for al Qaeda members and associates, Tr. 214-15; Supplemental App. 2255, 2260, 2261, 2262, 2268; (4) was a member of the Nairobi al Qaeda cell during a time when al Qaeda members were traveling to Nairobi to conduct surveillance of the American Embassy, train in al Qaeda-run military camps, and plan the attack on the

Embassy, Tr. 1258-63, 1193-1212; (5) served as the head of the Nairobi al Qaeda cell during a period post-dating Bin Laden's 1996 public declaration of holy war against the United States, Tr. 1210, 1251-52; (6) traveled to Afghanistan in February 1997 to meet with Bin Laden and Mohamed Atef, al Qaeda's military commander, and returned to Nairobi with a message from Bin Laden directing the Nairobi cell to prepare for military activity, Supplemental App. 1997-2005; and (7) appeared before a federal grand jury in September 1997, one month after he met again with Bin Laden and Atef, Supplemental App. 1974, and testified falsely as to al Qaeda's agenda as well as to the nature and extent of his contacts with Bin Laden and Atef, Tr. 807-10.[18]

Based on the government's evidence, it is clear that a rational fact-finder could have concluded that El-Hage (1) knew about the aims and objectives of the charged criminal conspiracies, (2) agreed to the essence of these objectives, and (3) performed acts, including committing perjury, intended to further these objectives. Accordingly, we see no basis to question, much less overturn, El-Hage's convictions for the criminal conspiracies charged in Counts One, Two, and Four of the Indictment.

2.     Odeh

Like El-Hage, Odeh was convicted of the criminal conspiracies charged in Counts One, Two, and Four of the Indictment as well as ten other crimes.[19] On appeal, Odeh contends that the government failed to present any evidence supporting his involvement in any of these offenses.

_____

[18] Specifically, El-Hage was asked: "When did you hear [that al Qaeda began to target the United States]?" Tr. 808. El-Hage responded: "In the latest interview with[O]sama Bin Laden [on] CNN." *Id.*

[19] As noted in the Background section, Odeh was also convicted of conspiracy to use weapons of mass destruction against U.S. nationals overseas in violation of 18 U.S.C. § 2332a(a)(1) & (3) (Count 3); bombing the American Embassy in Nairobi in violation of 18 U.S.C. § 844(f) (Count 5); use of weapons of mass destruction against U.S. nationals overseas in violation of 18 U.S.C. § 2332a(a)(1) & (3) (Count 7); murder of 213 individuals in the course of an attack on a U.S. facility, in violation of 18 U.S.C. § 930(c) (Counts 9-221); murder of U.S. officers and employees in violation of 18 U.S.C. § 1114 (Counts 233-73); attempted murder of officers and employees of the American Embassy in Nairobi in violation of 18 U.S.C. § 1114 (Count 274); murder of internationally protected persons in violation of 18 U.S.C. § 1116 (Counts 278-79); attempted murder of internationally protected persons in violation of 18 U.S.C. § 1116 (Count 280); using and carrying an explosive during commission of a felony, in violation of 18 U.S.C. § 844(h) (Count 282); and using and carrying an explosive device during a crime of violence, in violation of 18 U.S.C. § 924(c) (Count 283).

At trial, the government offered evidence that, prior to joining al Qaeda in 1992, Odeh attended an Afghani training camp where he was taught to use weapons and small explosives. Tr. 1626-32. Odeh's proficiency with these devices was such that al Qaeda subsequently paid him to train al Qaeda members and allies of the organization in their violent campaign against the United States. Tr. 1136-37, 1644-45. Odeh was also a member of the Nairobi cell throughout the period that members of the cell were planning the attack on the American Embassy in Nairobi. Tr. 1182-83, 1643-45, 1656-60. The heart of the government's case against Odeh, however, consisted of sketches discovered during a search of Odeh's apartment the day after the August 7, 1998 bombings. Supplemental App. 1975-76. The government argued to the jury that these sketches represented the area surrounding the American Embassy, including a depiction of an exploding truck bomb at the detonation site. Tr. 5495-5501. The government also introduced Odeh's post-arrest statement, Tr. 5497, as well as evidence that the explosive residue found on his clothing at the time of his arrest matched the materials used to make the Nairobi bomb, Tr. 5488-92. On appeal, Odeh contends that the sketches are at best "ambiguous." Odeh Br. 36. He also contends that, "even if those items were related to the bombing," their presence in his apartment "do[es] not prove that he actually aided or abetted the bombing." *Id.* at 36-37.

When evaluating whether the government's evidence is sufficient to support a conviction, we "review the separate pieces of evidence not in isolation but in conjunction," *United States v. Rigas*, 490 F.3d 208, 230 (2d Cir. 2007) (internal quotation marks, brackets, and ellipses omitted), drawing "all reasonable inferences in the light most favorable to . . . the jury's verdict," *id.* Viewed in this light, the record reveals substantial evidence supporting the government's theory that Odeh was guilty of the offenses charged in the indictment by virtue of his role as a "technical advisor . . . in the operation to bomb the American Embassy." Tr. 5501.

24

Odeh's argument that the sketches are too ambiguous to support the jury's verdict does not withstand scrutiny. At trial, the government displayed both sketches in side-by-side comparisons to diagrams of areas surrounding the American Embassy. Supplemental App. 1975-76; Tr. 5495-5501. The jury was thereby permitted to determine for itself whether the sketches depicted those areas, did not depict those areas, or were too ambiguous to reach a conclusion one way or another. We see nothing unreasonable in the jury's implicit determination that the sketches did, indeed, depict the area surrounding the American Embassy, and we therefore perceive no basis in the record to disturb the jury's determination. Similarly, Odeh's claims that the government did not adequately connect him with the sketches are unpersuasive in light of the government's introduction of post-arrest statements in which he expressed "anger and disappoint[ment]" that the truck bomb that blew up the American Embassy in Nairobi had been placed incorrectly—that is, not in the manner depicted in the sketch—resulting in diversion of the blast force away from the Embassy. Tr. 5498; Supplemental App. 1823.

For these reasons, we conclude that the evidence was sufficient to support El-Hage's conspiracy convictions and Odeh's convictions for the conspiracy and substantive offenses with which he was charged.

**C.      El-Hage's Challenge to the District Court's Application of the Classified Information Procedures Act**

El-Hage contends that the protective order entered by the District Court pursuant to the Classified Information Procedures Act ("CIPA"), Pub. L. No. 96-456, 94 Stat. 2025 (1980), *codified at* 18 U.S.C. app. 3, violated his (1) Sixth Amendment right to counsel, (2) Sixth Amendment right to confront the witnesses and evidence against him, (3) Fifth Amendment right to testify at trial, and (4) Fifth Amendment and Sixth Amendment rights to present a defense. El-Hage also contends that his exclusion from hearings at which classified material would be discussed violated his (5) Fifth

25

Amendment and Sixth Amendment rights to be present at a crucial stage in his trial. As described in greater detail below, each of these contentions is without merit.

1.      An Overview of CIPA

CIPA establishes rules for the management of criminal cases involving classified information.[20] Its animating purpose is "to harmonize a [criminal] defendant's right to obtain and present exculpatory material," *United States v. Pappas*, 94 F.3d 795, 799 (2d Cir. 1996) (internal quotation marks omitted), with the government's need "'to withhold information from discovery when disclosure would be inimical to national security,'" *United States v. Aref*, 533 F.3d 72, 79 (2d Cir. 2008) (quoting *Zuckerbraun v. Gen. Dynamics Corp.*, 935 F.2d 544, 546 (2d Cir. 1991)); *see also id.* at 78 (explaining that the government's ability to withhold classified information "most likely" derives from "the common-law privilege against disclosure of state secrets").

Section three of CIPA requires district courts to enter, "[u]pon motion of the United States," a protective order prohibiting "the disclosure of any classified information disclosed by the United States" to a criminal defendant, 18 U.S.C. app. 3, § 3. Section four provides that, if the discovery to be provided to the defense pursuant to the Federal Rules of Criminal Procedure includes classified information, the district court may, "upon a sufficient showing, . . . authorize the United States to delete specified items of classified information[,] . . . to substitute a summary of the information[,] . . . or to substitute a statement admitting relevant facts that the classified information would tend to prove." *Id.* § 4. Section five requires a defendant to give pretrial notice to the government and the court if he "reasonably expects to disclose or to cause the disclosure of classified information . . . in connection with any trial or pretrial proceeding involving [his] criminal prosecution." *Id.* § 5(a).

---

[20] "CIPA defines 'classified information' as 'information or material that has been determined by the United States Government pursuant to an Executive order, statute, or regulation, to require protection against unauthorized disclosure for reasons of national security.'" *United States v. Aref*, 533 F.3d 72, 78 n.2 (2d Cir. 2008) (quoting 18 U.S.C. app. 3 § 1(a)).

Section six requires district courts "to make all determinations concerning the use, relevance, or admissibility of classified information that would otherwise be made during the trial or pretrial proceeding" by means of a hearing that "shall be held in camera if the Attorney General certifies to the court in such petition that a public proceeding may result in the disclosure of classified information." *Id.* § 6(a). Section six also provides that, before the district court holds such a hearing, the government must give the defendant "notice of the classified information that is at issue," *id.* § 6(b)(1), as well as "such details as to the portion of the indictment or information at issue in the hearing as are needed to give the defendant fair notice to prepare for the hearing," *id.* § 6(b)(2). If a district court authorizes "the disclosure of specific classified information," the government may move to substitute "for such classified information . . . a statement admitting relevant facts that the specific classified information would tend to prove . . . or a summary of the specific classified information." *Id.* § 6(c)(1). A district court must grant the government's motion for a protective order "if it finds that the statement or summary will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." *Id.*

2.  The District Court's Application of CIPA to Confidential Information at Issue in the Prosecution of El-Hage and His Co-Defendants

In the spring of 1999, the government moved in the District Court for the entry of a protective order under CIPA to restrict access to classified information to individuals who qualified for a security clearance under regulations promulgated by the U.S. Department of Justice ("DOJ").[21] Defendants

---

[21] Pursuant to the applicable regulations,

[e]ligibility for access to classified information is limited to United States citizens for whom an appropriate investigation of their personal and professional history affirmatively indicated loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information. . . . Eligibility shall be granted only where facts and circumstances indicate access to classified information is clearly consistent with the national security interests of the United States and any doubt shall be resolved in favor of the national security.

27

filed a motion challenging the District Court's authority to impose a mandatory clearance requirement and objecting to the order that the government proposed. *See United States v. Bin Laden*, 58 F. Supp. 2d 113, 115-16 (S.D.N.Y. 1999).

The District Court denied defendants' motion in an opinion of June 30, 1999. *Id.* at 124. As an initial matter, the District Court observed that "CIPA and the accompanying Security Procedures [promulgated by Chief Justice Burger] create a system by which the trial court has wide latitude to impose reasonable restrictions likely to prevent the unauthorized disclosure of classified information," *id.* at 117, such as the imposition of a mandatory clearance requirement, *see id.* (noting that "the legislative history of CIPA . . . indicates that although neither Congress nor the Chief Justice sought to impose a mandatory clearance requirement in all cases involving classified information, they did not attempt to foreclose resort to such a requirement in all circumstances"). The District Court then determined that it was appropriate to require "every person who comes into contact with classified information in this litigation [to] undergo some objective evaluation" of their ability to avoid unauthorized disclosure of such information. The District Court based this decision on (1) "the exceptional facts alleged in the indictment," *id.* at 121; (2) the fact that "the [g]overnment's investigation is ongoing, which increases the possibility that unauthorized disclosures might place additional lives in danger," *id.*; and (3) the existence of other "special circumstances warranting particular control over the flow of classified information," *id.* (noting the government's allegation "that the [d]efendants are part of a conspiracy whose members have previously gained access to unfiled court documents and forwarded those documents to other members of the conspiracy").[22]

---

28 C.F.R. § 17.41(b).

[22] In the memorandum of law explaining why the government believed a mandatory clearance requirement to be necessary, the government noted that

> [T]he investigation has discovered that *al Qaeda* members submit "security reports" to *al Qaeda*'s headquarters reporting on concerns about the efforts of Western intelligence and law enforcement agencies to arrest or

28

On July 29, 1999, the District Court entered a protective order providing, in relevant part, that "[n]o defendant, counsel for a defendant, employee of a counsel for a defendant, defense witness, or Courtroom personnel . . . shall have access to any classified information involved in this case unless that person shall first have . . . received the necessary security clearance" pursuant to the regulations set forth by the DOJ. *United States v. Bin Laden*, No. 98 CR 1023, dkt. no. 78 at ¶ 5 (S.D.N.Y. July 29, 1999). El-Hage's defense counsel received security clearances in due course. El-Hage himself did not. "The practical result of [the July 29, 1999] order" was, therefore, that El-Hage's defense attorneys were able to "review a category of classified documents that they [could] not share with their client[ ]." *See United States v. Bin Laden*, No. 98 CR 1023, 2001 WL 66393, at *2 (S.D.N.Y. Jan. 25 2001).

On July 14, 2000, El-Hage's attorneys notified the District Court, pursuant to section five of CIPA, that they anticipated a need to disclose—to their client or to the jury—certain aspects of the classified material provided to them by the government. Also on July 14, 2000, El-Hage's counsel filed, under seal, a motion asking the District Court to declare CIPA "unconstitutional as applied in this case" because, *inter alia*, the construction of the statute adopted by the District Court in its protective order of July 29, 1999 prevented El-Hage from reviewing any classified material provided by the

---

capture *al Qaeda* members. In one report, found in Nairobi, Kenya in August 1997, an *al Qaeda* member believed to be [one of the defendants in the instant case] discussed the fact that a top Bin Laden operative had been arrested and was believed to be cooperating with Saudi, British, and American authorities. . . .

  *Al Qaeda* also monitors court papers related to trials of *al Qaeda* associates. For example, . . . Ali Mohamed [(a defendant in the instant case)] sent a document concerning the trial of Sheikh Omar Abdel Rahman, which took place in the Southern District of New York, from California, where he then lived, to the defendant Wadih El Hage in Kenya for further delivery to [O]sama Bin Laden. Upon information and belief, the document sent by Mohamed (who was not a defendant in that case) was provided to the defense in that case, but was not publicly filed.

Gov't Mem. in Resp. to Def.'s Mot. Opposing Security Clearances, *United States v. Bin Laden*, No. 98 CR 1023 (LBS), dkt. no. 65 at 4-6 (S.D.N.Y. June 8, 1999); *see also id.* (including, as an exhibit, a copy of the security report found in Nairobi, Kenya in August 1997).

government to his counsel.[23]  Appellants' App. 957.  The government objected to the disclosure of any classified information to El-Hage and opposed El-Hage's challenge to the constitutionality of CIPA. In doing so, the government noted that much of the material originally provided to El-Hage's counsel in classified form had already been declassified, allowing El-Hage's counsel to share those items with El-Hage.[24]  The government agreed that the treatment of the remaining classified items should be resolved at a pretrial hearing held by the District Court pursuant to CIPA section six.

The District Court held five *in camera* CIPA hearings in February 2001.  Portions of the February 6, 2001 hearing were conducted *ex parte*; the others were attended by counsel for both sides. El-Hage's defense attorneys, in the presence of the government, described in detail the classified material that they anticipated disclosing.  The District Court then excused El-Hage's counsel in order to inquire into the government's reasons for refusing to declassify these items.  After the government completed its presentation and was excused, the District Court recalled El-Hage's attorneys, inquiring, in the absence of government counsel, into the use that El-Hage's counsel planned to make of the classified information at issue.  Having established that El-Hage's attorneys wished to use the classified material for cross-examination of a government witness, the District Court suggested that the parties could work together to produce a paraphrased version of the relevant portions.  The District Court then recalled the government in order to discuss the merits of this proposal with counsel on both sides. On February 8, 2001, the District Court held a second *in camera* hearing to explore the parties' progress

---

[23] Specifically, El-Hage contended that his inability to review the classified material produced by the government or to attend any hearings involving discussion of classified information—a consequence of his inability to obtain a security clearance under the criteria set forth by the DOJ—violated his Sixth Amendment right to counsel, Sixth Amendment right to cross-examine the witnesses against him, Sixth Amendment right to be present at a crucial stage in his trial, Fifth Amendment right to testify at trial, and Fifth Amendment and Sixth Amendment rights to present a defense.  El-Hage also contended that CIPA's pretrial notice requirement, *see* 18 U.S.C. app. 3 at § 5*,* violated his Fifth Amendment right to remain silent.  *See Bin Laden*, 2001 WL 66393, at *1 (summarizing El-Hage's claims).

[24] The material that the government declassified included two items specifically identified by El-Hage's counsel in the sealed motion of July 14, 2000—namely, three facsimiles allegedly sent by El-Hage and tapes of conversations conducted over four telephone lines in Kenya.  *See* Gov't Mem. of Sept. 18, 2000, at 3-4; El-Hage Mem. of July 14, 2000, at 9-10.

30

in resolving the disclosure issue raised by El-Hage's counsel. At that hearing, the District Court considered the arguments of the parties and then concluded that the stipulation being offered by the government would serve El-Hage's needs *better* than the classified information to which he sought access because (1) effective use of the classified information by El-Hage's counsel "[did] not turn on the nuances or the specific language of [the classified document]" and (2) the stipulation—unlike the classified document—would definitively resolve the factual matters at issue. Hearing Tr. of Feb. 8, 2001, at 28, 18.

On February 13, 2001, the District Court held an *in camera* hearing on issues relating to a second item of classified information. El-Hage's counsel explained that they wished to use the classified information to elicit witness testimony that would establish El-Hage's state of mind at the time of a particular transaction; upon questioning by the District Court, however, counsel for El-Hage conceded that El-Hage was never actually aware of the facts that counsel was seeking to elicit from the witness. The government, meanwhile, offered to stipulate to the facts in question, thereby obviating the need for the witness testimony. The District Court found that (1) El-Hage's counsel was unable to establish how the testimony that counsel was trying to elicit through the use of the classified information was relevant to the defense's case and (2) even assuming that the testimony conveyed facts relevant to the defense, the stipulation being offered by the government was stronger evidence of the facts than the testimony that El-Hage's counsel was trying to elicit. Hearing Tr. of Feb. 13, 2001, at 22, 24. Accordingly, at an *in camera* hearing held the following day, the District Court denied El-Hage's request for disclosure to him of the classified information that the government had already provided to his counsel. Hearing Tr. of Feb. 14, 2001, at 9.

The District Court held two further *in camera* hearings on February 21, 2001. At the first hearing, the District Court established—to the satisfaction of El-Hage's counsel—that El-Hage's need

31

for a third item of classified material could be adequately met by the government's agreement to stipulate to the facts for which the defense planned to use the material. 1 Hearing Tr. of Feb. 21, 2001, at 7. At the second hearing, the District Court considered El-Hage's request for discovery of a fourth item of classified information. After giving El-Hage's counsel the opportunity to set forth their theory on the relevance of this information, the District Court explained that—based upon its review of an *ex parte* submission made by the government—it could represent with confidence that the classified information did not have the significance claimed by counsel. 2 Hearing Tr. of Feb. 21, 2001, at 5, 7. Accordingly, the District Court declined to provide El-Hage's counsel with access to the classified information at issue.

The District Court denied El-Hage's "as applied" challenge to the constitutionality of CIPA in an opinion issued on January 25, 2001. *See Bin Laden*, 2001 WL 66393, at *9. First, the District Court found that El-Hage had not identified any concrete harms arising from the entry of the protective order. As the District Court noted, one of the items El-Hage sought to review had been declassified already, while another was an item that neither party sought to introduce into evidence.[25] *See id.* at *4. The District Court also observed that, because El-Hage's attorneys had "seen the classified information at issue, it [was] not clear why" the provisions of the protective order should have a detrimental effect on El-Hage's ability to present a defense. *Id.* at *8. Second, the District Court concluded that El-Hage's own exclusion from any hearings where classified information was discussed did not violate El-

---

[25] The District Court explained:

[T]he [g]overnment has indicated that it does not plan to use the [item] at trial and [the defense] does not seem to suggest any intention to use the evidence as part of the defense case. If this situation changes, the Court will revisit the question of the need for disclosure . . . to the [d]efendant . . . [but, in the meanwhile,] [d]efendant['s] suggest[ions] that disclosure might enable him to assist counsel in making decisions about his representation . . . [constitute a] hypothetical benefit . . . insufficient to warrant a finding that the application of CIPA in this case is unconstitutional.

*Bin Laden*, 2001 WL 66393, at *4 (internal citation omitted).

32

Hage's Sixth Amendment right to be present because "questions . . . regarding the protection of classified information are questions of law which may be resolved outside the presence of the defendant." *Id.* at *7; *see also id.* at *5 ("The suggestion that the [d]efendant 'might' contribute to the predominantly legal process of designating relevant evidence is not sufficient to warrant a finding that CIPA is being applied to deprive the Defendant of his constitutional right to confront witnesses."). Finally, the District Court rejected El-Hage's invitation to invalidate section five of CIPA, concluding instead that CIPA's pretrial notice provision was no different from the requirement to provide pretrial disclosure of "the intention to offer an alibi defense, an insanity defense, a public authority defense, or certain medical tests or tangible objects." *Bin Laden*, 2001 WL 66393 at *8.

On appeal, El-Hage renews his constitutional challenges to the disclosure limitations imposed by the District Court pursuant to sections three and six of CIPA. El-Hage Br. 261, 264. He does not renew his challenge to the constitutionality of the pretrial notice requirement set forth in section five of CIPA. *Id.* at 235-52.

3.      CIPA Authorized the District Court to Permit Only Individuals with Security Clearances to View Classified Information

El-Hage challenges the District Court's conclusion that the most appropriate way "to minimize the risk of the unauthorized disclosure of classified information," *Bin Laden*, 58 F. Supp. 2d at 121, was to limit access to classified material to individuals who could obtain security clearance—namely, United States citizens whose "personal and professional history affirmatively indicate[ ] *loyalty to the United States*, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment, as well as *freedom from conflicting allegiances* and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information." 28 C.F.R. § 17.41(b) (emphasis added). By conditioning access to classified information on a security clearance requirement that El-Hage could not meet, the protective order entered by the District Court on July 29, 1999

effectively barred El-Hage from personally reviewing the classified material produced by the government. El-Hage claims that these limitations deprived him of access to discoverable information to which he was entitled.

CIPA imposes upon district courts a mandatory duty to guard against the unauthorized "disclosure of any classified material disclosed by the United States to any defendant in any criminal case." 18 U.S.C. appendix 3 at § 3; *see id.* (stating that "[u]pon motion of the United States, the court *shall* issue an order to protect against the disclosure of any classified information disclosed by the United States to any defendant in any criminal case" (emphasis added)); *id.* § 6(a) (providing that "if the Attorney General certifies to the court" that a public hearing on disputes about the "use, relevance, or admissibility of classified information . . . may result in the disclosure of classified information," the district court "*shall*" hold the hearing *in camera* (emphasis added)); *id.* § 6(c) (providing that when a district court authorizes "the disclosure of specific classified information" and the government moves to substitute for the classified information a "[stipulation] or summary that would provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information," the district court "*shall* grant" the government's motion (emphasis added)); *id.* § 6(d) ("If at the close of an in camera hearing[,] . . . the court determines that the classified information at issue may not be disclosed or elicited at the trial or pretrial proceeding, the record of such in camera hearing *shall* be sealed . . . ." (emphasis added)).

CIPA's provisions on discovery, which complement those of Rule 16(d) of the Federal Rules of Criminal Procedure, seek to "give trial judges adequate guidance to protect against the unauthorized disclosure of classified information in the custody of the federal courts." *See* Background Material for Chairman Boland and Chairman Rodino on the Security Procedures for the Protection of Classified Information in the Custody of the Federal Courts, at 5, *appended to* Letter from Chief Justice Warren E.

34

Burger to Rep. Peter W. Rodino (July 10, 1981) ("Chief Justice's Letter").[26] According to the report on

CIPA by the Senate Judiciary Committee, Congress perceived such guidance to be "necessary because

some judges [were] reluctant to use their authority [to restrict discovery pursuant to Rule 16(d)(1)]"

even though the advisory notes to Rule 16(d)(1) clearly state that "in deciding . . . whether to permit

discovery to be 'denied, restricted, or deferred,'" a district court should take into account, *inter alia*, the

need to "'protect[ ] . . . information vital to the national security.'" S. Rep. 96-823, at 6 (1980), *reprinted

in* 1980 U.S.C.C.A.N. 4294, 4329-30 (quoting Fed. R. Crim. P. 16 advisory committee's note to 1966

amendment).

Like Rule 16(d), however, CIPA leaves the precise conditions under which the defense may

obtain access to discoverable information to the informed discretion of the district court. *Compare* Fed.

R. Crim. P. 16(d)(1) (stating that "[a]t any time the court *may*, for good cause, deny, restrict, or defer

discovery or inspection . . . "(emphasis added)) *with* 18 U.S.C. app. 3 at § 4 ("[U]pon a sufficient

showing, [the district court] *may authorize* the United States to delete specified items of classified

information from documents to be made available to the defendant through discovery under the

Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified

---

[26] The Chief Justice's Letter responds to a query by Congressman Boland and Congressman Rodino "concerning the security procedures for handling classified information in federal courts," which, pursuant to section nine of CIPA, Chief Justice Burger helped to draft.

Section nine of CIPA states that:

Within one hundred and twenty days of the date of the enactment of this Act, the Chief Justice of the United States, in consultation with the Attorney General, the Director of National Intelligence, and the Secretary of Defense, shall prescribe rules establishing procedures for the protection against unauthorized disclosure of any classified information in the custody of the United States district courts, courts of appeal, or Supreme Court. Such rules, and any changes in such rules, shall be submitted to the appropriate committees of Congress and shall become effective forty-five days after such submission.

18 U.S.C. app. 3 at § 9.

documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove." (emphasis added)); *cf. United States v. Delia*, 944 F.2d 1010, 1018 (2d Cir. 1991) (noting that because the language of Rule 16(d)(1) "is . . . permissive," the district court may "limit or otherwise regulate discovery had pursuant to the Rule"); *see also* Chief Justice's Letter, at 2 ("The trial judge, and the trial judge alone . . . decides what classified information the defendant is entitled to receive from the government and what provisions are to be included in a protective order"); *id.* at 5 ("[T]he trial court judge [remains] free to make whatever decision he wishes to make with regard to defense access to classified information, [and] . . . [CIPA] in no way interfere[s] with the judge's discretion in this regard.").

We have recently held that the discretion conferred upon district courts by CIPA encompasses entry of an order permitting the government to withhold altogether "classified information that might otherwise have been discoverable," *Aref*, 533 F.3d at 76, as long as this information is neither "helpful [n]or material to the defense," *id.* at 80. We now hold that CIPA authorizes district courts to limit access to classified information to persons with a security clearance as long as the application of this requirement does not deprive the defense of evidence that would be "useful to counter the government's case or to bolster a defense." *Id.* (internal quotation marks omitted). The requirement that individuals seeking access to classified material establish their trustworthiness by obtaining a security clearance is consistent with CIPA's imposition on the district courts of a mandatory duty to prevent the unauthorized disclosure of classified information "in the custody of the United States . . . courts," 18 U.S.C. app. 3 at § 9. It is also consistent with CIPA's security procedures, which authorize the government to "obtain information by any lawful means concerning the trustworthiness of persons associated with the defense and [to] bring such information to the attention of the court for the court's consideration in framing an appropriate protective order . . . ." *See* Security Procedures Established

36

Pursuant to Public Law 96-456, 18 U.S.C. app. 3 § 9 note at ¶ 5; *see also* Chief Justice's Letter at 2 ("The aim of Section five [of the security procedures] is to assist the court in framing an appropriate protective order by making . . . clear what kind of information may be properly considered by the court in determining what constraints, if any, should be placed on persons acting on behalf of the defense who are given access to classified information.").

Having concluded that the District Court possessed the authority to limit access to classified information to persons with a security clearance, we now consider whether the District Court's decision to impose a clearance requirement in the instant case rested on any error that would render its decision questionable or unsound. *Cf. Delia*, 944 F.2d at 1018 (noting that where the language "authoriz[ing] the district court to limit or otherwise regulate discovery . . . is not mandatory, but permissive[,] . . . a denial of disclosure . . . will be set aside only if such denial constituted an abuse of discretion"); *United States v. Tsekhanovich*, 507 F.3d 127, 129 (2d Cir. 2007) ("A district court 'abuses' or 'exceeds' the discretion accorded to it when . . . its decision rests on an error of law . . . or a clearly erroneous factual finding, or [leaves a reviewing court with the definite impression that a mistake has been made, for example because] its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." (quoting *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001))).

Here, the District Court found that, based on "the exceptional facts alleged in the indictment" and the "ongoing" nature of the government's investigation, unauthorized disclosure of classified information relating to the instant case could result in "a particularly disastrous security breach"—one that "might place additional lives in danger." *Bin Laden*, 58 F. Supp. 2d at 121. El-Hage does not identify any error in these findings, nor does our review of the record reveal any. Accordingly, we

37

conclude that the District Court's decision to impose a mandatory clearance requirement for access to classified information, pursuant to CIPA, was well within its informed discretion.

4. El-Hage's Fifth and Sixth Amendment Challenges to the Mandatory Clearance Requirement

According to El-Hage, the District Court's mandatory clearance requirement placed off-limits to him "important evidence which could not adequately be interpreted by counsel alone," El-Hage Br. 267, thereby violating (1) his right to present a defense as guaranteed by the Fifth Amendment and Sixth Amendment, *id.* at 273-75, and (2) his Sixth Amendment right to counsel, *id.* at 262.[27] In their submissions to the District Court, El-Hage's attorneys described several items of classified material that, they contended, "must be discussed with Mr. El-Hage prior to his testimony if his right to counsel (as well as his right to testify[)] . . . is to have any meaning." El-Hage Mem. of July 14, 2000 ("El-Hage Mem."), at 9. El-Hage's counsel also made the general argument that, in the absence of any knowledge about which government witnesses would be testifying at trial, they required El-Hage's assistance to determine what portions of the classified material provided by the government to El-Hage's counsel were relevant to El-Hage's defense. *Id.* at 15. El-Hage's submissions to this Court do not identify the items of classified information that, in retrospect, El-Hage could have helped his counsel interpret. El-Hage's counsel stated an intention to describe these items in "a classified Brief to be filed separately," El-Hage Br. 253, but filed no such brief. We therefore proceed on the assumption that the "important

---

[27] El-Hage also contends that this requirement violated his Sixth Amendment right to confront the witnesses and evidence against him, El-Hage Br. at 267, and his Fifth Amendment right to testify at trial, *id.* at 274. Because the government's evidence against El-Hage did not include testimony by a witness whom El-Hage did not have the opportunity to cross-examine, and because El-Hage was not prevented from taking the stand on his own behalf, we proceed on the understanding that El-Hage's claims that he was denied his Sixth Amendment right of confrontation and Fifth Amendment right to testify at trial represent a reframing of El-Hage's claim that he was deprived of his right to present a defense as guaranteed by the Fifth Amendment and Sixth Amendment of the U.S. Constitution. *See* El-Hage Br. 269 (claiming that the security clearance requirement "precluded Mr. El-Hage from making any contribution . . . to the cross-examination of government witnesses"); *id.* at 275 (claiming that El-Hage's inability to discuss classified material with his counsel left El-Hage unable to "prepare adequately for his projected testimony").

38

evidence" to which El-Hage refers, *id.* at 267, consists of the classified material discussed at the *in camera* hearings held by the District Court on February 6, 8, 13, 14, and 21 of 2001.[28]

Where the government seeks to restrict a criminal defendant's "discovery of evidence in the interest of national security," *Aref*, 533 F.3d at 78, a district court must determine whether the criminal defendant's interest in the information at issue outweighs the government's interest in withholding it. As we recently explained,

> [T]he district court must first decide whether the classified information the [g]overnment possesses is discoverable. If it is, the district court must then determine whether the state-secrets privilege applies because . . . there is a reasonable danger that compulsion of the evidence will expose matters which, in the interest of national security, should not be divulged . . . .
>
> If the evidence is discoverable but the information is privileged, the court must next decide whether the information is helpful or material to the defense, i.e., useful to counter the government's case or to bolster a defense. . . .

*Id.* at 80 (internal alteration and quotation marks omitted). If the information in question is "useful 'to counter the government's case or to bolster a defense,'" *id.* (quoting the interpretation of the "materiality standard under Federal Rule of Criminal Procedure 16(a)(1)" set forth in *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993)), the government's privilege "must give way . . . to [the] criminal defendant's right to present a meaningful defense," *id.* at 79. If, however, the information in question is not material under the standards set forth in Rule 16(a), the government may properly withhold it from the defendant. *Id.* at 80 (noting that, to meet the standards for materiality set forth in Rule 16, "evidence need not rise to the level that would trigger the [g]overnment's [constitutional] obligation . . . to disclose exculpatory information").

---

[28] As noted above, *see* note 24, *ante*, the government declassified certain items after El-Hage submitted his sealed memorandum of July 14, 2000. The material discussed at the *in camera* hearings consisted of items that were both (1) identified by El-Hage in his sealed memorandum and/or reply memorandum and (2) still classified at the time of the first *in camera* hearing.

a.     The Classified Information Was Not Subject to Discovery under the Federal Rules of Criminal Procedure

To determine whether the classified material sought by El-Hage was discoverable, we look to Rule 16 of the Federal Rules of Criminal Procedure, which establishes base-line requirements for pretrial discovery in a criminal case. *See, e.g.*, *United States v. Nobles*, 422 U.S. 225, 235 (1975); *Premises Known as 225, 1468 and 1470 Statler Towers v. United States*, 787 F.2d 796, 798 (2d Cir. 1986). Rule 16(a)(1)(E) provides that items such as the material at issue here—namely, "documents and objects" in the government's control—are discoverable if, *inter alia*, they are "material to preparing the defense."[29]

"An appellate court, in assessing the materiality of withheld information, considers not only the logical relationship between the information and the issues in the case, but also the importance of the information in light of the evidence as a whole." *Stevens*, 985 F.2d at 1180. In the instant case, the government stipulated to all of the facts that El-Hage was seeking to establish through use of the classified information. In the case of two items, the District Court reasonably concluded that the stipulation offered by the government left El-Hage with *better evidence* than he would have obtained from the classified material. *See* Hearing Tr. of Feb. 8, 2001, at 18 (noting that the stipulation put El-Hage's counsel "so much more ahead of the game than if [El-Hage] had the document," because "the witness could say that he doesn't recall seeing [the document] . . ."); Hearing Tr. of Feb. 13, 2001, at 22 ("[T]he stipulation gives you more than the inference you're going to ask the jury to draw from a very complex set of facts . . . . It seems to me [that] you're better off having the stipulation than facts on which you will ask the jury to draw an inference"). Regarding the third item, El-Hage's counsel agreed with the District Court that the stipulation offered by the government was "adequate for [El-Hage's stated] purposes," and the classified material requested in the sealed submissions was not needed to

---

[29] Rule 16(a)(1)(E)(ii) also provides that evidence is discoverable if "the government intends to use the item in its case-in-chief at trial" or "the item was obtained from or belongs to the defendant." It is undisputed that the classified material at issue does not meet either of these two criteria.

40

establish the points El-Hage's counsel was seeking to make.  1 Hearing Tr. of Feb. 21, 2001, at 7.

Regarding the final item, the District Court accurately represented to El-Hage's counsel that the

classified information in question was not relevant to the defense case.

Based on our independent review of the classified information in question, we agree with the

District Court that none of the items discussed at the February 2001 *in camera* hearings meets the

criteria for discoverability set forth in Rule 16(a)(1)(E).  Accordingly, we conclude that the District

Court did not deny El-Hage access to any evidence that El-Hage was entitled to consult under the rules

of criminal discovery.  Indeed, we commend the District Court on its diligent examination of the

evidence and careful consideration of El-Hage's claims.

> b.        Even if the Classified Information Was Subject to Discovery, El-Hage
>            Would Not Have Been Entitled to Inspect It Personally

Even if we assume for the argument that the material sought by El-Hage did meet the

threshold condition of discoverability, it is clear that any interest El-Hage had in personally inspecting

the material was insufficient to outweigh the government's interest in avoiding unauthorized

disclosures of classified information.  Our review of the record indicates that unauthorized disclosure

of any of the four items of classified information discussed by the parties at the CIPA hearing would,

most certainly, "'expose matters which, in the interest of national security, should not be divulged.'"

*Aref*, 533 F.3d at 80 (quoting *Reynolds v. United States*, 345 U.S. 1, 10 (1953) (alteration omitted)).  El-

Hage's countervailing interest, in comparison, appears slight at best.  For the reasons set forth above,

we detect no error—let alone abuse of discretion, *see id.* ("Whether evidence is 'helpful' or 'material to

the defense'" is a matter "within the district court's discretion.")—in the District Court's conclusion

that it is "difficult to envision a circumstance in which [El-Hage's counsel] would ask any of the

41

[questions that counsel proposed to ask] and get a reply . . . which would require resort to the specific language of [any classified] documents."[30]  Hearing Tr. of Feb. 8, 2001, at 28-29.

In addition, we note that all of the classified material containing information worthy of disclosure by stipulation of the parties—that is, three out of the four items to which El-Hage sought access—were made available for the preparation of El-Hage's defense through the production of classified documents to El-Hage's attorneys, who possessed the security clearances necessary to review and inspect such material.  *See* Gov't Mem. of Sept. 18, 2000, at 6 (noting that, "[i]n a case of this magnitude, the [g]overnment has chosen to provide more, rather than less, discovery to cleared defense counsel"); *id.* (noting the government's position "that production of certain classified discovery to cleared defense counsel [does not] mean[ ] that the [g]overnment concedes the relevance of that material"); 2 Hearing Tr. of Feb. 21, 2001, at 6 (observing that the classified discovery on which El-Hage's counsel based their disclosure requests consisted in large part of "material which the government very readily can get an order from the court saying [that it] need not be furnished").

Our understanding that production of materials to a party's attorney alone falls within the common meaning of "discovery"[31] further strengthens our conviction that the discovery restrictions imposed by the District Court were perfectly appropriate and valid in light of the standard by which our Court determines when the government's privilege "must give way . . . to a criminal defendant's right to present a meaningful defense." *Aref*, 533 F.3d at 79; *see also id.* at 79-80 (adopting the standard set forth in *Roviaro v. United States*, 353 U.S. 53 (1957), for determining "when the [g]overnment's privilege must give way in a CIPA case"); *Roviaro*, 353 U.S. at 59-61 (observing that fundamental

---

[30] While the District Court made this observation with respect to the classified items discussed at the hearings of February 6 and February 8, 2001, we find it equally applicable to the items discussed at the other CIPA hearings.

[31] *See, e.g.*, *King v. PA Consulting Group, Inc,*. 485 F.3d 577, 584 (10th Cir. 2007) (finding no abuse of discretion by the district court in a case where, "[b]ecause the evidence included a number of confidential, proprietary documents, discovery was conducted under a Consent Protective Order" under which "[t]he most sensitive documents were designated 'Attorneys' Eyes Only,' prohibiting the parties from viewing them").

fairness requires "the [g]overnment's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law" to give way "[w]here the disclosure of an informer's identity, or of the contents of his communication, *is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause*" (emphasis added)).

        c.        El-Hage's Right to Present a Defense Was Not Violated by the Mandatory Clearance Requirement

As we have recently re-affirmed, "[w]hile a defendant has the right to present a complete defense, that right is not without limits." *Hawkins v. Costello*, 460 F.3d 238, 243 (2d Cir. 2006). For example, a criminal defendant's right to cross-examine the witnesses in his case "is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973). When putting his case to the jury, for example, a defendant "must comply with established rules of procedure and evidence." *Id.* at 302. Even a defendant's "right to introduce relevant evidence can be curtailed if there is a good reason for doing that." *Clark v. Arizona*, 548 U.S. 735, 770 (2006).

In evaluating El-Hage's claim that his inability to consult classified material "violated [his] right to present a complete defense, we start with the propriety of the [District Court's] evidentiary ruling[s]." *Hawkins*, 460 F.3d at 244 (internal quotation marks omitted). As noted above, the terms of the protective order entered by the District Court gave El-Hage's counsel access to all classified material arguably relevant to El-Hage's defense, and provided El-Hage himself with access to all of the relevant facts set forth in that material. In light of the government's willingness to stipulate to the information El-Hage's counsel was seeking to adduce from the classified material, the District Court did not err in concluding that there was nothing to be gained—and much to be lost—by providing El-Hage himself with access to the original material. *Cf.* Fed. R. Evid. 403 (noting that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of . . .

43

needless presentation of cumulative evidence"). In sum, we hold that the combined effects of the protective order and the District Court's evidentiary decisions—both carefully made pursuant to the authority explicitly conferred upon the District Court by CIPA and its implementing procedures and regulations—did not violate El-Hage's Fifth Amendment and Sixth Amendment rights to present a defense.[32]

> d. El-Hage's Right to Counsel Was Not Violated by the Mandatory Clearance Requirement

For similar reasons, we also conclude that the District Court's efforts to execute the duties imposed upon it by CIPA did not violate El-Hage's Sixth Amendment right to counsel. Following the Supreme Court's decision in *Perry v. Leeke*, 488 U.S. 272 (1989), we have recognized on more than one occasion that "[n]ot all restrictions on communication between a defendant and his counsel are constitutionally prohibited." *United States v. Triumph Capital Group, Inc.*, 487 F.3d 124, 129 (2d Cir. 2007). More specifically, we have concluded that "[i]n certain contexts there can be an 'important need to protect a countervailing interest,' which may justify a restriction on the defendant's ability to consult with his attorney if the restriction is 'carefully tailored' and 'limited.'" *Id.* (quoting *Morgan v. Bennett*, 204 F.3d 360, 367 (2d Cir. 2000)). Ascertaining the permissibility of a particular restriction requires "'an intensely context-specific inquiry.'" *Id.* at 131 (quoting *Serrano v. Fischer*, 412 F.3d 292, 300 (2d Cir. 2005)); *see also id.* (noting that our Circuit's understanding of the Supreme Court's decisions in *Geders v. United States*, 425 U.S. 80 (1976), and *Perry v. Leeke*, *ante*, "provides no 'bright-line rule' for determining when, and what kind of, restrictions on the communication between a defendant and his counsel are

---

[32] Nor did the protective order violate El-Hage's Sixth Amendment right to cross-examine the witnesses against him, or his Fifth Amendment right to testify at trial. *See* note 27, *ante* (explaining why El-Hage's claims that he was denied his Sixth Amendment right of confrontation and Fifth Amendment right to testify at trial amount to a reframing of his claim that he was deprived of his constitutional rights to present a defense).

permissible"). In essence, "[t]he types of restrictions that are justifiable will depend on the interests that the restrictions are aiming to protect." *Id.* at 131 n.4.

In the instant case, the District Court found that the unauthorized disclosure of classified information relating to the government's investigation of El-Hage might constitute "a particularly disastrous security breach"—one that, perhaps, "might place . . . lives in danger." *Bin Laden*, 58 F. Supp. 2d at 121. To minimize the likelihood of such an occurrence, it required, pursuant to applicable regulations, that all persons who sought access to classified material demonstrate their "willingness and ability to abide by regulations governing the use, handling, and protection of classified information." 28 C.F.R. § 17.41(b). At the same time, it sought to satisfy any need that El-Hage's defense team may have had for the contents of the classified material by permitting El-Hage's attorneys to review the material. Moreover, El-Hage's attorneys were allowed to share the relevant facts with El-Hage. Considering the interests at stake in the instant case and the accommodations devised by the District Court, we conclude that "not only were the restrictions carefully tailored to the problem at hand, but also that the evil they intended to prevent was '*far more troubling* than the possibility of witness coaching involved in *Geders* and *Perry*.'" *Triumph Capital*, 487 F.3d at 131 n.4 (quoting *Morgan*, 204 F.3d at 367)). We therefore reject El-Hage's claim that the discovery limitations imposed by the District Court violated his Sixth Amendment right to counsel.

5. El-Hage's Exclusion from the CIPA Hearings

El-Hage also contends that, by preventing him from attending hearings where classified material would be discussed, the protective measure selected by the District Court violated his right to be present at a crucial stage in his trial as guaranteed by the Fifth Amendment and Sixth Amendment. El-Hage Br. 271. Because no witnesses testified at the hearings in question, we proceed on the understanding that El-Hage is claiming a violation of the rights guaranteed to him by the Due Process

Clause of the Fifth Amendment. *Cf. United States v. Peterson*, 385 F.3d 127, 137 (2d Cir. 2004) ("A criminal defendant's constitutional right to be present at various stages of his trial is rooted in the Confrontation Clause of the Sixth Amendment and, when confrontation is not at issue, the Due Process Clause of the Fifth Amendment.").

The Due Process Clause entitles a criminal defendant "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975); *accord Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir. 2002). As the Supreme Court has explained, however, "'[t]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only.*'" *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (emphasis added) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 108 (1934)). The Court has also observed that "the exclusion of a defendant from a trial proceeding should be considered in light of the whole record." *Id.* at 526-27.

In *Gagnon*, the Supreme Court upheld the exclusion of criminal defendants from an *in camera* conference at which the judge, a juror, and the lawyer for one defendant were present. Observing that, based on the issues discussed at the conference, the defendants' presence would have been unhelpful for the cause of the defense and "counterproductive" for the purposes of the proceeding, the Court concluded that "the conference was not the sort of event which . . . [the] defendant[s] had a right personally to attend under the Fifth Amendment." *Id.* at 527; *see also id.* (noting that the the defendants "could have done nothing had they been at the conference, nor would they have gained anything by attending"). Applying the teaching of *Gagnon*, our Court, in *United States v. Peterson*, upheld a district court's exclusion of criminal defendants from two *in camera* conferences held in their case—one between the judge and a juror, the other between the judge and defendants' trial counsel. 385 F.3d at 138. We explained that, because the conferences in question involved an issue of trial

46

management—rather than any factual development of the record—the defendants' presence was unnecessary. *See id.* (noting that "[h]ad defendants been present, they could not have assisted" because "[t]hese meetings were more akin to hearings on an issue of law to which a defendant has little to contribute than to stages of trial at which a defendant has a due process or statutory right to be present."). We also observed that because the issue of trial management arose within the context of a potentially sensitive situation—namely, a possible incident of juror misconduct—the defendants' absence may have helped the district court to conduct "a fair and just" inquiry into the situation. *Id.* (observing that "[the defendants'] presence may have prevented juror number three from speaking openly"). On this basis, we concluded that the district court's decision to exclude the defendants from the conferences "was neither a due process violation nor a violation of Federal Rule of Criminal Procedure 43."[33] *Id.*

A generation earlier, in *United States v. Bell*, we determined that a district court had properly excluded a criminal defendant from an *in camera* hearing at which a witness discussed information that was sensitive for public safety reasons and fell outside the personal knowledge of the defendant. 464 F.2d 667, 672 (2d Cir. 1972). In upholding this restriction on the defendant's right to be present, we noted that (1) the "justification" for barring the defendant was "compelling"—namely, the need to guard "the confidentiality of the profile which has been devised as a method to reduce the threat of [airline] hijacking," *id.* at 669, and thereby to "protect[ ] . . . the air travelling public," *id.* at 670; (2) the defendant's exclusion was necessary because the defendant's personal history did not "inspire[ ] confidence in his selection as a safe repository of the hijacking profile," *id.* at 672, and disclosure of the details of the profile would make it "not only . . . possible but relatively simple for a prospective

---

[33] Pursuant to Rule 43, "the defendant must be present at: (1) the initial appearance, the initial arraignment, and the plea; (2) every trial stage, including jury impanelment and the return of the verdict; and (3) sentencing," unless another rule provides otherwise. Fed. R. Crim. P. 43.

hijacker to avoid the initial designation," *id.* at 670; (3) the restriction on the defendant's presence was carefully limited because defendant's counsel was permitted to participate on defendant's behalf, *id.* at 669; *see also United States v. Clark*, 475 F.2d 240, 245 (2d Cir. 1973) (discussing *Bell* with approval and describing the restriction imposed as "carefully limited"); and (4) the substance of the matters discussed at the hearing "bore no relationship at all to the question of [the defendant's] guilt or innocence of the crime charged," *Bell*, 464 F2d at 671.

In the instant case, the District Court's decision to exclude El-Hage from hearings at which classified information was discussed finds support in all four of the factors that we identified in *Bell* and discussed approvingly in *Clark*. First, the District Court's justification for limiting attendance at the CIPA hearings, like the justification we identified in *Bell*, consisted of the need to avoid jeopardizing lives through the unauthorized disclosure of sensitive information. Second, based on El-Hage's undisputed connection to Osama Bin Laden and suspected involvement in the transmission of non-public court papers to Bin Laden, *see* note 22, *ante*, El-Hage's ability to keep the classified information at issue confidential was highly suspect—rendering it necessary to exclude him from proceedings where classified information would be discussed. Third, as in *Bell*, El-Hage's attorneys were permitted to attend the hearing and participate on his behalf. Fourth, like the matters discussed at the hearing in *Bell*, the matters discussed at the February 2001 CIPA hearings "bore no relationship at all to the question of [El-Hage's] guilt or innocence of the crime[s] charged," *Bell*, 464 F2d at 671. In that sense, "[El-Hage] could have done nothing had [he] been at the [hearing], nor would [he] have gained anything [to which he was entitled] by attending" *Gagnon*, 470 U.S. at 527. Accordingly, because "a fair and just [CIPA] hearing would [not] be thwarted by [El-Hage's] absence" from such a hearing, *id.* at 526, we conclude that the District Court's exclusion of El-Hage from hearings at which classified

material was discussed did not violate El-Hage's due process right to be present at a crucial stage in his trial.

In sum, we conclude that: (1) the District Court possessed the authority to limit access to classified information to individuals with a security clearance; (2) the District Court's decision to impose a clearance requirement did not rest on any factual error; (3) the clearance requirement was not legally erroneous because it did not deprive El-Hage of access to any evidence that he was entitled to consult under the rules of criminal discovery, nor did it violate El-Hage's constitutional rights to consult with counsel or present a complete defense; and (4) the exclusion of El-Hage from hearings at which classified information was discussed—a consequence of the clearance requirement permitted by CIPA and applicable regulations, and imposed by the District Court—did not violate El-Hage's due process right to be present at a crucial stage in his trial.

**D.      El-Hage's Motion to Sever His Trial from That of His Co-Defendants**

On appeal, El-Hage renews his claim that he should be granted a new trial based on the District Court's denial of his motion to sever his trial from the trial of his co-defendants. El-Hage Br. 233; *see United States v. Bin Laden*, 109 F. Supp. 2d 211 (S.D.N.Y. 2000) (discussing in detail the pretrial severance motion); *United States v. Bin Laden*, No. 98 Cr. 1023, 2001 WL 1160604, at *6-7 (S.D.N.Y. Oct. 2, 2001) (considering El-Hage's post-trial arguments that he was prejudiced by the joint trial). Specifically, he contends that being jointly tried with death-eligible co-defendants prejudiced him "incurably," El-Hage Br. 236, and that "he was denied his Sixth Amendment confrontation trial rights by the admission of a co-defendant's testimonial statement against him," *id.* at 235.

Rule 14 of the Federal Rules of Criminal Procedure provides that, if a joint trial "appears to prejudice a defendant[,] . . . the court *may* . . . sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a) (emphasis added). As the Supreme Court has noted, "Rule 14

49

does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993). Accordingly, we review a district court's decision to deny a motion for severance for abuse of discretion. *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003).

In light of the "preference in the federal system for joint trials of defendants who are indicted together," *Zafiro*, 506 U.S. at 537, "[w]e rarely overturn the denial of a motion to sever," *Feyrer*, 333 F.3d at 114-15. *See also Zafiro*, 506 U.S. at 537 (noting that joint trials "promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts'" (quoting *Richardson v. Marsh*, 481 U.S. 200, 210 (1987))); *Feyrer*, 333 F.3d at 114 ("For reasons of economy, convenience and avoidance of delay, there is a preference in the federal system for providing defendants who are indicted together with joint trials."). Indeed, we have observed that "a district court order denying a Rule 14 motion . . . will be overturned 'only if a defendant can show prejudice so severe that his conviction constituted a miscarriage of justice and that the denial of his motion constituted an abuse of discretion.'" *United States v. Yousef*, 327 F.3d 56, 150 (2d Cir. 2003) (quoting *United States v. Diaz*, 176 F.3d 52, 102 (2d Cir. 1999)).

1.      El-Hage's Objections to Being Tried with Death-eligible Co-defendants

El-Hage claims that the prejudice he experienced as a result of being tried together with his death-eligible co-defendants "manifested itself in two forms." El-Hage Br. 236. First, "jurors who would have been eligible to serve in a non-death case . . . [but for] their categorical opposition to (or support for) the death penalty . . . were excused for cause." *Id.* Second, "the strategy of [his] death-eligible [co-]defendants was . . . in irreconcilable conflict with the aims of the non-capital defendants." *Id.*

50

El-Hage's claim that he was prejudiced by the "death qualification" of the jury—*i.e.*, the exclusion of jurors with categorical opposition to or support for the death penalty—is foreclosed by the holding of the Supreme Court in *Buchanan v. Kentucky*, 483 U.S. 402 (1987). In *Buchanan*, the Court rejected the claims of a criminal defendant that he "was deprived of his right to an impartial jury . . . because the [government] was permitted to 'death-qualify' the jury in his joint trial where the death penalty was sought against his codefendant." *Id.* at 404, 416. The "death-qualification" process, in the Court's view, did not produce a jury that was unable to "'conscientiously apply the law and find the facts'" in a criminal case. *Id.* at 417 (quoting *Lockhart v. McCree*, 476 U.S. 162, 178 (1986)). Because "jury impartiality requires only jurors who will conscientiously apply the law and find the facts," *id.* (internal quotation marks omitted), the Court concluded that there was no basis to question a jury's impartiality simply because it had been death qualified, *id.* at 420. El-Hage provides no persuasive distinction between his challenge to the death-qualification process in his case and the one at issue in *Buchanan*. Accordingly, we hold that El-Hage's argument is without merit.

Regarding El-Hage's claim of irreconcilable defense strategies, we note that even if El-Hage's death-eligible co-defendants had pursued a trial strategy that was mutually antagonistic with El-Hage's trial strategy, that factor alone would be insufficient to establish that the District Court had erred—let alone abused its discretion—in denying El-Hage's motion for a separate trial. We have previously explained that "[d]efenses are mutually antagonistic when accepting one defense requires that 'the jury must of necessity convict a second defendant.'" *Yousef*, 327 F.3d at 151 (quoting *United States v. Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991)); *cf. Zafiro*, 506 U.S. at 542 (Stevens, J., concurring) (noting that a situation of "'mutually antagonistic' defenses" arises when "acceptance of one defense . . . necessarily preclude[s] acceptance of the other and acquittal of the codefendant"). As the Supreme Court has noted, "[m]utually antagonistic defenses are not prejudicial *per se*." *Zafiro*, 506 U.S. at 538; *see*

51

*also Yousef*, 327 F.3d at 151.  Rather, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro*, 506 U.S. at 539.

El-Hage identifies several instances in which, he claims, his death-eligible co-defendants attempted to rationalize the targeting of the American Embassies, El-Hage Br. 241-42, and elicited evidence about the violent nature of al Qaeda's aims in an effort to emphasize their lesser culpability in comparison with the government's cooperating witnesses and within the al Qaeda organization as a whole, *id.* at 243-44.  According to El-Hage, this evidence prejudiced him because it (1) represented an attempt to "offer a justification for an act that Mr. El-Hage has always deemed unjustifiable on any ground," *id.* at 241 (emphasis omitted), and (2) undermined his position that he had "associate[d] with al Qaeda members" without being aware of al Qaeda's "violent and/or anti-American agenda," *id.* at 244.

We perceive no conflict between El-Hage's rejection of the embassy bombings and his co-defendants' attempts to justify the bombings, or between El-Hage's claim of ignorance about al Qaeda's activities and his co-defendants' emphasis that al Qaeda "did not hesitate to engage in conduct that would kill the maximum number of victims, regardless of the civilian casualties suffered as a result," *id.* at 243.  Indeed, we agree with the District Court that some of the testimony, such as an "Imam's testimony that a Muslim should opt for the least violent means of protest," *Bin Laden*, 2001 WL 1160604, at *7 (citing Tr. 4661), could ultimately have weighed in El-Hage's favor.  So would, in our view, the contrast between the positions taken by El-Hage and those attributed to his co-defendants because they allowed El-Hage to seem relatively less culpable than his co-defendants.

We see no error or abuse of discretion in the decision of the District Court to deny El-Hage's motion to sever his trial from the trial of his death-eligible co-defendants.  Nor do we believe that El-

Hage suffered any prejudice, let alone prejudice sufficient to trigger the granting of a new trial, due to his joint trial with these co-defendants.

2. Confrontation Clause Claim

At trial, both the government and counsel for El-Hage's co-defendant Odeh considered introducing into evidence the report of the FBI agent who interviewed Odeh in Nairobi, Kenya. Tr. 1574, 1697. El-Hage's attorneys contended that, in order to avoid any unfairness to El-Hage, the portion of the agent's report reading "Odeh stated that Wadih El Hage gave him an identification card for NGO Africa Help [also called 'Help Africa People']" should be redacted to read "Odeh stated that he was given [an] identification card for an NGO and Odeh used this card." *Id.* at 1582-84. As El-Hage's counsel explained, because "Africa Help" was the name of El-Hage's NGO and El-Hage's examination before the Grand Jury had included a question about whether he gave this identification card to Odeh, a redaction that preserved the name of the NGO would "clearly indicate[ ]" that Odeh was speaking about El-Hage. *Id.* at 1581-82. The government objected to the redaction of the NGO's name on the basis that (1) it was using the statement in part to prove that "Help Africa People was involved in providing [false] identity cards," *id.* at 1585, and (2) even though El-Hage had denied providing the card in his grand jury testimony, he was not facing any perjury charges relating to his statement, *id.* at 1584-85.[34]

---

[34] The Grand Jury exchange was as follows:

Government: Did you not provide an identity document to the person depicted in Grand Jury Exhibit 5, Mohamed O[ ]deh, from your organization Help Africa People, yes or no?"

El-Hage: Did I give him any help from the organization?

Government: Yes.

El-Hage: No.

Government: Did you give him an identity document to use with his name and that picture?

El-Hage: Never.

The District Court agreed with the government, concluding that nothing on the face of the redacted statement "Odeh stated that he was given _____ an _____ identification card for the NGO, Africa Help" was incriminating to El-Hage. *See* Appellants' App. 756 (reproducing Odeh statement) (underlined areas left blank in original). The District Court observed that the redacted statement did not pose a situation "where the context makes clear that the only person who could have been the reference is the defendant [El-Hage]" because "anybody could have given [Odeh] an identification card for Africa Help." Tr. 1585. This was so because the record did not establish "whether any other people were involved in Africa Help or if it was a one-man operation," and, therefore, El-Hage's involvement was not "a compelled inference." *Id.* The following day, counsel for Odeh introduced the redacted statement into evidence while cross-examining the government agent who had interviewed Odeh in Nairobi. Tr. 1697.

On appeal, El-Hage renews his claim that, in light of his Grand Jury testimony, the redaction was insufficient to satisfy the requirements of *Bruton v. United States*, 391 U.S. 123, 137 (1968), and therefore the only way to have avoided violating his Sixth Amendment right to confront the witnesses against him would have been to sever his trial from that of Odeh. *See* El-Hage Br. 250.

In *Bruton*, the Supreme Court held that "a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 207 (1987) (discussing and applying *Bruton*). Even a redacted statement may run afoul of the rule set forth in *Bruton* if the redactions "simply replace [the

---

Government:     Did you give him an identity document to use with any picture of him?

El-Hage:         I don't remember seeing this person before or this picture.

*See* Appellant's App. 650 (reproducing colloquy).

54

defendant's] name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration," such that the remaining text "closely resemble[s] . . . [the] unredacted statement[ ]." *Gray v. Maryland*, 523 U.S. 185, 192 (1998). A confession "redacted to eliminate not only the defendant's name, but any reference to his or her existence" is, however, acceptable if accompanied by a proper limiting instruction. *Id.* at 191 (quoting *Richardson*, 481 U.S. at 211); *see also United States v. Lung Fong Chen*, 393 F.3d 139, 148 (2d Cir. 2004).

As the Supreme Court has explained, whether or not a redaction sufficiently protects a criminal defendant's rights "depend[s] in significant part upon the kind of . . . inference" that the jury may draw in light of the redaction. *Gray*, 523 U.S. at 196 (emphasis omitted). Admission of "statements that [do] not refer directly to the defendant himself and which [become] incriminating 'only when linked with evidence introduced later at trial'" does not violate the rule set forth in *Bruton*. *Id.* (quoting *Richardson*, 481 U.S. at 208). "[S]tatements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial," have the effect of "facially incriminat[ing] the [confessing individual's] co-defendant," thereby rendering them unsuitable for admission under *Bruton*. *Id.* (internal quotation marks and emphasis omitted).

In the instant case, El-Hage does not contend that Odeh's statement, standing alone, incriminated him. Rather, he claims that "*the combination* of the redacted statement by Mr. Odeh and Mr. El-Hage's grand jury testimony telegraphed quite plainly to the jury that Mr. El-Hage was allegedly the 'someone in Nairobi' who Mr. Odeh claims gave him an identity card." El-Hage Br. 248 (emphasis added). El-Hage also observes that "the close association of Mr. El-Hage with Help Africa People . . . further revealed the identity of the 'someone' referred to in Mr. Odeh's statement." *Id.* El-Hage argues, therefore, that the District Court's admission of the redacted statement "[became] incriminating

'only when linked with [other] evidence introduced . . . at trial.'" *Gray*, 523 U.S. at 196 (quoting *Richardson*, 481 U.S. at 208). Based on the guidance set forth by the Supreme Court in *Gray*, it is clear that the statement in question did not run afoul of the rule set forth in *Bruton*. *Cf. Lung Fong Chen*, 393 F.3d at 150 (concluding that the statements at issue in that case "[fell] safely outside of *Bruton*'s scope because substantial evidence was necessary to link [the moving] defendants . . . with [their non-testifying co-defendant's] statements" and further noting that the moving defendants "implicitly recognize this point in their brief" by observing that the statements incriminated them only when taken in the context of other "testimony and argument").

Accordingly, because El-Hage did not suffer any prejudice from being tried jointly with his co-defendants and because the admission of Odeh's statement did not violate El-Hage's rights under *Bruton*, we conclude that the District Court did not err in denying El-Hage's motion for a separate trial, and we likewise deny El-Hage's request for a new trial.

E.    **The Admission of Certain Statements of El-Hage's Co-Defendants, Co-Conspirators, and Other Third Parties**

El-Hage challenges the District Court's decision to admit certain statements of his co-defendants, his co-conspirators, and other third parties as evidence at trial. First, El-Hage argues that the admission of the post-arrest, testimonial statements of his co-defendants violated his Sixth Amendment right to confront the witnesses against him.[35] Second, he contends that the District Court erred by admitting certain third-party statements pursuant to the co-conspirator exception set forth in Rule 801(d)(2)(E) of the Federal Rules of Evidence. Third, he claims that the District Court erred by admitting scores of documents seized from several locations in the United Kingdom and from Mercy

---

[35] Pursuant to the Sixth Amendment to the United States Constitution, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

International Relief Agency in Nairobi, Kenya, because those documents were not sufficiently connected to the conspiracy.

We review a district court's "[c]onclusions of law, including those involving constitutional questions, . . . *de novo*." *United States v. Fell*, 531 F.3d 197, 209 (2d Cir. 2008). We review a district court's evidentiary rulings for abuse of discretion, reversing only when (1) the district court's "'decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions.'" *United States v. Tsekhanovich*, 507 F.3d 127, 129 (2d Cir. 2007) (quoting *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001)); *see also United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 87 (2d Cir. 1999) (noting that we reverse "[e]videntiary rulings . . . only if they are manifestly erroneous," and that, "[i]n general, this court will not overturn a trial judge's evidentiary rulings unless the judge acted arbitrarily or irrationally" (internal quotation marks omitted)).

1. The Post-Arrest, Testimonial Statements by El-Hage's Co-Defendants

At the time of El-Hage's trial, this Circuit permitted district courts to admit testimonial statements of a co-defendant in order to establish "the existence of a conspiracy and conduct in furtherance thereof," even when that co-defendant was unavailable for cross-examination. *United States v. Snype*, 441 F.3d 119, 128 (2d Cir. 2006) (citing, as examples, *United States v. Dolah*, 245 F.3d 98, 104-05 (2d Cir. 2001), and *United States v. Moskowitz*, 215 F.3d 265, 269 (2d Cir. 2000)). Subsequently, however, the Supreme Court ruled, in *Crawford v. Washington*, 541 U.S. 36 (2004), "that the Confrontation Clause did not permit [testimonial] out-of-court statements to be received in evidence." *Snype*, 441 F.3d at 128; *see also id.* (noting that "*Crawford* specifically criticized our decisions in *Dolah* and *Moskowitz*, as well as similar rulings by our sister circuits and state courts").

57

El-Hage contends that, in violation of the Confrontation Clause, the District Court admitted the statements of El-Hage's co-defendants against him for the purpose of "establishing the charged conspiracies." El-Hage Br. 33. This assertion is flatly contradicted by the record, which reveals that the District Court admitted each testimonial statement at issue only against the defendant who made the statement, and not against the other defendants. *See* Tr. 2161 (rejecting the government's request to admit co-conspirator admissions against all defendants for purposes of establishing "the existence of the conspiracy" and resolving instead to instruct the jury that "the evidence of one defendant's statements to the authorities after his arrest about his own conduct may not be considered or discussed . . . in any way with respect to any defendant on trial other than the defendant who made the statement"); *id.* at 4696 (instruction of the District Court to the jury during trial, stating that "I have previously told you, and I will repeat it again in a written instruction, that . . . once an alleged conspirator is arrested, statements made after the arrest may be considered only with respect to the speaker . . . [t]herefore, the testimony which is now being elicited with respect to statements made by the defendant Odeh to the agent following [Odeh's] arrest may be considered only with respect to Odeh and may not be considered with respect to the other defendants"); Appellants' App. 294 (jury charge, stating that "[y]ou are cautioned that, unless I explicitly instruct you otherwise, the evidence of one defendant's statement to the authorities after his arrest may not be considered or discussed by you in any way with respect to any defendant on trial other than the defendant who made the statement").[36]

_____

[36] El-Hage acknowledges that the statements of defendant Khalfan Mohammed and defendant-appellant Mohamed Rashed Daoud al-'Owhali "were admitted against them only, with a limiting instruction." El-Hage Br. 34; *see also id.* at 291 (same). He insists, however, that "Odeh's statement was admitted not only against [Odeh], but against the other defendants as well for purposes of establishing the charged conspiracies." *Id.* at 33; *see also id.* at 101 ("Consistent with Second Circuit law at the time, Mr. Odeh's statement—a 34-page catalog of his life with al Qaeda—was admitted against all defendants, including Mr. El-Hage, for the purposes of establishing the existence of the charged conspiracies."); *id.* at 291 (same).

As discussed above, however, the record clearly belies El-Hage's claims as to the District Court's treatment of Odeh's custodial statements.

58

We have held that we will "presume that juries follow limiting instructions" unless "'there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense.'" *United States v. Becker*, 502 F.3d 122, 130 (2d Cir. 2007) (quoting *United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994)); *see also Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (recognizing "the almost invariable assumption of the law that jurors follow their instructions" and discussing the "many varying contexts" in which the Supreme Court has applied this assumption). In the instant case, the record contains no indication that the jury was unable to follow the limiting instruction set forth by the District Court. Nor, in light of the substantial other evidence against El-Hage, were statements from these co-defendants "devastating" to El-Hage's defense. *Cf. United States v. Bin Laden*, 397 F. Supp. 2d 465, 515-18 (S.D.N.Y. 2005) (summarizing "the substantial evidence establishing El-Hage's participation in the charged conspiracies after Bin Laden openly declared war on the United States in 1996"). Accordingly, we conclude that, in light of the limiting instructions of the District Court, El-Hage has failed to establish a Sixth Amendment violation arising from the District Court's decision to admit the testimonial statements of El-Hage's co-defendants for use only against each of them.

2.     The Application of the Hearsay Rule to the Statements of El-Hage's Co-Conspirators

El-Hage also contends that the District Court erred by admitting the statements of his co-conspirators pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence, which exempts the statements of co-conspirators from the hearsay rule. Specifically, he challenges the District Court's admission of (1) third-party statements through the testimony of Jamal al-Fadl, a government witness, El-Hage Br. 94; and (2) phone conversations recorded from a landline and cellular telephone used in Nairobi by El-Hage and other individuals, *id.* at 95, 97.

Rule 801(d)(2)(E) provides that "[a] statement is not hearsay if [t]he statement is offered against a party and is . . . [made] by a coconspirator of a party during the course and in furtherance of the conspiracy." It also limits the extent to which a conspiracy can be proven with this type of evidence: "The contents of the statement shall be considered but are not alone sufficient to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered." Fed. R. Evid. 801(d)(2)(E).

El-Hage claims that the District Court's evidentiary rulings were erroneous because "the government never presented sufficient proof that many of the declarants were . . . members of the conspiracies in which . . . Mr. El-Hage is alleged to have participated." El-Hage Br. 90; *see also id.* (asserting that "the statements were inadmissible because either (or both) the declarants were not proven to be members of any conspiracy to violate United States law, and/or because the conversations during which they were uttered were not in furtherance of any such conspiracy").

Because factual predicates for evidentiary rulings must be determined by the district court, *see* Fed. R. Evid. 104(a), "the existence of a conspiracy and [an individual's] involvement in it," as "preliminary questions of fact[,] . . . must be resolved by the [district] court." *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). A preponderance-of-the-evidence standard governs the district court's preliminary factual determination. *Id.* Accordingly, "[w]e review . . . for clear error" a district court's findings as to whether "'there was a conspiracy involving the declarant and the nonoffering party, and [whether] the statement was made during the course and in furtherance of the conspiracy.'" *United States v. Orena*, 32 F.3d 704, 711 (2d Cir. 1994) (quoting *Bourjaily*, 483 U.S. at 175-76).

      a.     The District Court's Conclusion that the Declarants Were Members of the Conspiracy

El-Hage contends that the evidence was insufficient to establish that the following declarants were members of a conspiracy "factually intertwined with the offenses being tried," *United States v.*

*Stratton*, 779 F.2d 820, 829 (2d Cir. 1985) (internal quotation marks omitted): (1) Abu Talal al Masry (a.k.a. Saleh), (2) Abu Fadl al Makee (a.k.a. Madani al Tayyib), (3) Mohamed Suleiman al Nalfi, and (4) Abu Rida al Suri (a.k.a. Mohamed Loay Bayazid). *See* El-Hage Br. 94-95. We disagree.

A fact-finder may properly find the existence of a criminal conspiracy where the evidence is sufficient to establish, by a preponderance of the evidence, that "the . . . alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir. 1989); *see also United States v. Salameh*, 152 F.3d 88, 151 (2d Cir. 1998) (observing that conspiracy requires, *inter alia*, "agree[ment] on the essential nature of the plan" and "some knowledge of the conspiracy's unlawful aims and objectives" (alterations and internal quotation marks omitted)). Based on the evidence summarized below, we conclude that the District Court did not err in determining that the declarants identified by El-Hage were members of a factually-relevant conspiracy.

i.      Abu Talal al Masry (a.k.a. Saleh)

L'Houssaine Kherchtou, a cooperating witness and former member of the Nairobi al Qaeda cell, testified at trial that Saleh was a member of "the military committee of al Qaeda." Tr. 1126. In addition, FBI Agent Stephen Gaudin, who interviewed Al-'Owhali in Kenya, stated that "[A]l-'Owhali explained to [him] that Saleh was the planner of . . . the bombing in Nairobi and the bombing in Dar es Salaam" and the "leader of the cell that was going to carry out both of these attacks." *Id.* at 1971, 1976, 2013. John Michael Anticev, the FBI agent who interviewed Odeh in Kenya, testified that, according to Odeh, it was Saleh who, in the days before the embassy bombings, conveyed "word from Bin Laden" that al Qaeda members should "start getting [their] affairs in order and start getting documents" so that they could "[get] out of Kenya," *id.* at 1616, 1667-68; and Saleh who provided

Odeh with the money and false documents that Odeh used to leave the country the day before the bombings, *id.* at 1675-78, 1686.

ii.      Abu Fadl al Makee (a.k.a. Madani al Tayyib)

Jamal al-Fadl, a cooperating witness for the government, testified that al Tayyib was a member of al Qaeda's committee on "money and business," which supplied the funds for al Qaeda members to obtain plane tickets and false passports. *Id.* at 161, 209, 214. Al Tayyib's role in al Qaeda's activities was confirmed in a report on al Qaeda's security prepared by al Qaeda member Fazul Mohammed ("Harun"). *See* Supplemental App. 1978-79 (co-conspirator expressing concern that al Tayyib was the cooperating witness described in news sources as "the distributor of [O]sama bin [L]aden's money which is used against the USA").

iii.      Mohamed Suleiman al Nalfi

In his trial testimony, al-Fadl identified al Nalfi as a member of al Qaeda, and stated that he had accompanied al Nalfi to the home of an al Qaeda military commander (Mohammed Atef, a.k.a. Abu Hafs el Masry) to hear a report about the status of al Qaeda's activities in Somalia. Tr. 283. Al Nalfi himself was later apprehended and, in February 2003, was convicted of violating 18 U.S.C. § 2155(b) (conspiracy to destroy national defense materials, premises, or utilities) following his plea of guilty before the District Court.

iv.      Abu Rida al Suri (a.k.a. Mohamed Loay Bayazid)

Al-Fadl testified that Bayazid was a member of the delegation that Bin Laden sent overseas to investigate whether al Qaeda should consider relocating from Afghanistan and Pakistan to the Sudan, *id.* at 216-17. He also testified that, after al Qaeda relocated, Bayazid was involved in planning the transportation of Stinger missiles and anti-tank rockets from Afghanistan to Sudan. *Id.* at 272-73.

b.      The Admission into Evidence of Statements by El-Hage's Co-Conspirators

In addition to challenging the District Court's admission, through al-Fadl's testimony, of statements made by the above declarants, El-Hage also challenges the District Court's admission of statements from intercepted phone calls involving, *inter alia*, the following individuals: April Ray El-Hage, Ahmed Tawhil (a.k.a. Ahmed Sheikh Adam), Ahmed Hassan, Abu Khadija, Ahmed Mohamed Hamed Ali (a.k.a. Ahmed the Egyptian), Fazul Mohammed (a.k.a. Harun), and an individual called "Saad." *See* El-Hage Br. 94-100 (identifying statements in question).

We have previously recognized that a statement is made "in furtherance" of the conspiracy if it "'provide[s] reassurance, [or] serve[s] to maintain trust and cohesiveness among [the conspirators], . . . [or] inform[s] [other conspirators] of the current status of the conspiracy.'" *United States v. Simmons,* 923 F.2d 934, 945 (2d Cir. 1991) (quoting *United States v. Rahme*, 813 F.2d 31, 35-36 (2d Cir. 1987)). We have recognized also that "statements designed to induce a listener's assistance [also] satisfy the requirements of [Rule] 801(d)(2)(E)." *Id.* "Though the Rule requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, there is no requirement that the person to whom the statement is made also be a member." *Beech-Nut Nutrition Corp.*, 871 F.2d at 1199 (citation omitted). "Because what constitutes a statement that is 'in furtherance' of a conspiracy is essentially a question of fact, we will reverse a decision to admit co-conspirator statements only if it is clearly erroneous," *Simmons,* 923 F.2d at 945, and "'[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous,'" *Beech-Nut Nutrition Corp.*, 871 F.2d at 1199 (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)).

The co-conspirator statements identified by El-Hage include: the advice Saleh gave to al-Fadl on how al-Fadl should conceal his identity when "traveling on behalf of al Qaeda outside the Afghanistan-Pakistan area," Tr. 212-14; a statement by Abu Fadl al Makee and Abu Rida al Suri declaring that they were seeking to transport Stinger missiles and Milan anti-tank rockets from

63

Afghanistan to Sudan, *id.* at 272-73; and a statement by al Nalfi about al Qaeda's intention to establish a cell in London, *id.* at 305-307.[37]

The intercepted phone calls identified by El-Hage include conversations in which: April Ray El-Hage informs her husband that other al Qaeda conspirators have left messages for him, Supplemental App. 1878-79 (message from Abu Khadija); *id.* at 1953 (message from Mohammed Atef); El-Hage speaks to April Ray El-Hage in code and reveals his concern that his phone calls may be monitored, *id.* at 1917; al Qaeda members Harun and Ahmad Hassan discuss al Qaeda business, *id.* at 1860 (discussing the preparation of a letter for travel); al Qaeda members Saad and Harun discuss al Qaeda business, *id.* at 1859; Harun and Ahmad Tawhil, an al Qaeda associate, discuss al Qaeda business, Appellant's App. 2519-20; El-Hage discusses the possibility of supplying false travel documents, in code, with an unidentified individual, Supplemental App. 1940; Appellants' App. 2505-06; El-Hage and Saad discuss transmittal of false documents, Supplemental App. 1876; an unidentified male asks Harun about using the al Qaeda satellite phone in El-Hage's possession, and is informed by Harun that the phone is reserved for "special phone calls from [Bin Laden]," *id.* at 1948; El-Hage discusses the delivery of documents to Ahmad Tawhil, an al Qaeda associate, *id.* at 1922; Harun and Abu Khadija discuss the need to investigate whether al Tayyib was cooperating with U.S. authorities, *id.* at 1961-62; Mohammed Atef conveys flight details to an unidentified male, Appellants' App. 2480; al Qaeda member Abu Islam al Sirir and an unidentified female discuss the travel plans of Saleh and Bin Laden, *id.* at 2500; El-Hage discusses al Qaeda financial matters with Tawfik, an al Qaeda associate, *id.*

---

[37] El-Hage also claims that the District Court incorrectly admitted two statements by Saleh. *See* El-Hage Br. 94 (identifying transcript pages 282 and 284 as containing the statements in question). Pages 282 through 284 contain statements by one individual with a name similar to Abu Talal al Masry—namely, Abu Hafs el Masry—and a statement *about* an individual with another similar sounding name: namely, Saif al Islam al Masry. Abu Hafs el Masry (a.k.a. Mohammed Atef) was an al Qaeda military commander, and the statement in question consisted of a report about the status of al Qaeda's activities in Somalia. Tr. 283. Accordingly, insofar as El-Hage challenges the admission of Atef's statement to al-Fadl, we conclude that this statement was properly admitted by the District Court.

at 2549, 2554; and Tawfik, Ahmad Tawhil, and Harun discuss financial matters, Gov't Trial Ex. 220B-T.

Upon our review of the record, we see no basis to disturb the determination of the District Court that the statements identified by El-Hage were made (1) by members of a factually-relevant conspiracy (2) in furtherance of that conspiracy. Accordingly, we see no error in the District Court's decision to admit these statements into evidence pursuant to Rule 801(d)(2)(E).

3.      The Admission of Certain Documents Offered by the Government

El-Hage contends that the District Court should not have admitted "scores of documents seized from MIRA [(Mercy International Relief Agency)] in Nairobi, Kenya, and from several locations in . . . the U.K.," because there was insufficient evidence "connecting most of those documents with any conspiracy to violate United States law." El-Hage Br. 96. El-Hage does not identify with any specificity the documents he believes were admitted in error; nor does he provide any indication of the significance of these documents to the government's case against him. Because El-Hage provides no basis for this Court to evaluate his challenge to the admissibility of these documents—and, upon our own review of the record, we perceive none—we conclude that there was no error in their admission.

In sum, we conclude that the District Court did not err or abuse its discretion by admitting the statements of El-Hage's co-defendants, co-conspirators, and other third parties. Accordingly, we reject El-Hage's challenges to these decisions.

**F.      El-Hage's Motion for a New Trial Based on the Post-Conviction Disclosure of Recorded Statements of a Government Witness**

We now turn to El-Hage's argument that he was entitled to a new trial based on the government's alleged failure to make a timely disclosure of videotapes documenting pretrial conversations between prosecutors and a former al Qaeda member who testified for the prosecution "about the history, structure and operation of al Qaeda" as well as "about some of El-Hage's al Qaeda

65

activities." *United States v. Bin Laden*, 397 F. Supp. 2d 465, 474 (S.D.N.Y. 2005). As explained in greater detail below, we see no merit in El-Hage's argument.

        1.       The Post-Conviction Discovery of Videotaped Interviews and El-Hage's Motion for a New Trial

In or around January 2002—eight months after the jury returned a verdict of guilt against El-Hage and three months after the District Court entered a judgment of conviction against him—U.S. Attorney Patrick J. Fitzgerald[38] discovered that twelve of the government's pretrial conferences with Jamal al-Fadl, a former al Qaeda member who testified for the prosecution, had been videotaped by al-Fadl's liaison to the U.S. Marshals Service Witness Security Program ("WitSec"), and the tapes were being kept by the U.S. Marshals Service ("USMS") at their headquarters in Washington, D.C. *Bin Laden*, 397 F. Supp. 2d at 475, 476. "Almost immediately after learning of the taping," Fitzgerald and AUSA Kenneth M. Karas contacted the Department of Justice Office of Enforcement Operations ("OEO") to explain "the importance of maintaining the tapes" and the need to convey the tapes to AUSA Karas "as soon as possible." *Id.* at 477. AUSA Karas continued to place follow-up phone calls to OEO throughout February and March of 2002. *Id.* at 477-78. He finally received copies of the tapes, edited for security reasons by the USMS, on or about March 21, 2002. *Id.* at 478. He never obtained the original tapes or a complete copy thereof. *Id.*

> Upon receiving the tapes, AUSA Karas and other Southern District AUSAs had them transcribed. They reviewed those transcriptions and redacted various portions to protect the identities of certain individuals and to protect operational information that they believed was not subject to discovery. The prosecutors then provided these redacted transcripts to counsel for El-Hage and his codefendants.

*Id.* at 478.

---

[38] Patrick J. Fitzgerald and Kenneth M. Karas were two of the "primary Assistant United States Attorneys . . . responsible for [Jamal] al-Fadl and for the prosecution of El-Hage and his codefendants." 397 F. Supp. 2d at 476-77 nn. 8-9. At the time of the events described in the District Court's opinion, Fitzgerald was serving as the United States Attorney for the Northern District of Illinois. *Id.* at 476 n.8.

On January 15, 2003, while his appeal was pending before our Court,[39] El-Hage filed a motion for a limited remand to the District Court in order to file a motion pursuant to Rule 33 of the Federal Rules of Criminal Procedure for a new trial based on the government's failure to effect timely disclosure of the tapes.[40] We denied the motion for remand but granted El-Hage an extension of time within which to file his appellate brief.

On October 24, 2003, El-Hage filed a motion in the District Court seeking a new trial based on the government's failure to make a timely disclosure of the tapes as required by *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the Jencks Act, 18 U.S.C. § 3500. Judge Kevin Thomas Duffy[41] noted the government's representations that it first learned about these recordings in early 2002—well after El-Hage had been tried and sentenced—and held hearings to explore the circumstances surrounding the creation of the tapes and the government's discovery of their existence. *Bin Laden*, 397 F. Supp. 2d at 479-80.

On May 12, 2005, El-Hage filed a motion in the Court of Appeals to hold his appeal in abeyance until Judge Duffy resolved his motion for a new trial. El-Hage noted that this Court had given him until May 23, 2005 to file his appellate brief, but the District Court was still conducting evidentiary hearings on matters related to his Rule 33 motion for a new trial. He further noted that the government consented to his application to suspend the appeal. We granted El-Hage's motion on May 25, 2005.

---

[39] El-Hage had filed a notice of appeal on October 25, 2001.

[40] Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires" and that "[a] motion for a new trial grounded on newly discovered evidence" is timely if "filed within 3 years after the verdict or finding of guilty." Fed. R. Crim. P. 33.

[41] On January 23, 2002, this case was reassigned within the Southern District of New York, from Judge Leonard B. Sand to Judge Kevin Thomas Duffy.

Judge Duffy held additional evidentiary hearings on June 6, 2005 and June 7, 2005. *Id.* at 474. On November 2, 2005, Judge Duffy filed an opinion making the following factual findings, none of which is challenged on appeal:

"On July 16, 1997, pursuant to a cooperation agreement, al-Fadl pleaded guilty" to various charges involving his activities on behalf of al Qaeda. *Id.* "Following his guilty plea, al-Fadl . . . continued cooperating with FBI agents and AUSAs." *Id.* "In late 1998, [he] was accepted into the Witness Security Program administered by the United States Marshals Service," assigned a WitSec liaison, and relocated to a new, remote, location. *Id.* at 474-75. "Following his relocation, and throughout 1999, al-Fadl continued to meet with FBI agents and prosecutors via telephone and in person via 'neutral site' visits." *Id.* at 475.

> In late December 1999, the Southern District of New York Assistant United States Attorneys who had been interviewing al-Fadl . . . requested that WitSec install videoconferencing equipment in al-Fadl's relocation area to facilitate their contact with al-Fadl. . . . WitSec complied with the request and, by the end of 1999, purchased and installed video conferencing equipment . . . in WitSec offices in al-Fadl's relocation area and [in] New York . . . .

> Around the time Marshals Service employees were installing the videoconference equipment, [al-Fadl's WitSec liaison] spoke with [a branch chief inspector] . . . stationed at USMS Headquarters in Washington, D.C.[ ], regarding . . . the al-Fadl teleconferences. [He] was told that the Marshals Service computer system in the relocation area was unable to handle classified information and that he should therefore videotape the teleconferences rather than preparing detailed written reports. Finding this order odd, [the WitSec liaison,] Inspector Doe[,] sought confirmation from his direct supervisor, Supervisory Inspector Mike.[42] Supervisory Inspector Mike conferred with the Chief Inspector for the relocation area . . . who confirmed that USMS Headquarters had ordered the videotaping of the video-teleconferences . . . .

> Eighteen video-teleconferences were conducted between January 21, 2000 and January 14, 2002. Thirteen of the conferences occurred before the conclusion of El-Hage's trial; twelve of these were videotaped. . . . In all, Inspector Doe recorded approximately twenty-eight hours of video-teleconference on six videotapes. . . .

---

[42] "Inspector Doe" and "Supervisory Inspector Mike" are pseudonyms adopted by the District Court "[i]n deference to the security concerns of the WitSec program." *Bin Laden*, 397 F. Supp. 2d at 475 n.3.

*Id.* at 475-76. "After each conference Inspector Doe prepared a USMS Field Report ('USM 210') with

the date of the video-teleconference," a brief statement that al-Fadl had been interviewed on closed-

circuit television by an AUSA, and a reference to "the number of the videotape on which he had

recorded the session." *Id.* at 476. "Inspector Doe then presented the printed report to Supervisory

Inspector Mike who reviewed it, signed it and forwarded it to USMS headquarters in Washington. At

headquarters, the report was to be reviewed by the case manager on al-Fadl's case and placed in

al-Fadl's [USMS] file." *Id.* at 476.

> After creating the videotapes and reporting them to his superiors, Inspector Doe
> secured the tapes in his office safe. At no point prior to or during El-Hage's 2001 trial did
> Inspector Doe, Supervisory Inspector Mike, [the branch chief inspector from USMS
> headquarters in Washington], [the Chief Inspector for the relocation area], or any of the five
> case managers from al-Fadl's case contact the United States Attorney's Office to discuss turning
> over the tapes to the prosecutors for possible disclosure to the defendants.

*Id.* The District Court further found that

> [i]n late 2001, George Dapra, the WitSec Inspector in the New York area who had acted as the
> prosecutors' liaison with Inspector Doe, . . . called Inspector Doe to make arrangements for the
> transition to a new Inspector in the New York area. During that call, Inspector Doe asked
> Inspector Dapra what he should do with the videotapes of the al-Fadl conferences. Inspector
> Dapra responded that he had not known of any tapes, and he subsequently called United States
> Attorney Patrick Fitzgerald to inform him of the tapes' existence.

*Id.* "[U.S. Attorney] Fitzgerald was . . . shocked and angered to learn of the taping," *id.*; "[AUSA] Karas

. . . was equally surprised and upset." *Id.*

Although Judge Duffy concluded that WitSec personnel were members of the prosecution

team, he nevertheless ruled, "[b]ased on the evidence adduced at th[e] [post-trial] hearings, . . . review

of the . . . videotapes, the trial record and exhibits, the pre-trial discovery . . . originally produced, and

the parties' submissions," *id.* at 474, that a new trial was not warranted, *id.* at 518. El-Hage moved for

reconsideration of the District Court's denial of his Rule 33 motion, and, in an order entered on

December 5, 2005, Judge Duffy denied El-Hage's motion for reconsideration of the November 2

opinion and order. El-Hage now appeals Judge Duffy's orders of November 2, 2005 and December 5, 2005. On appeal, he contends that the videotapes contained "evidence which relates directly to . . . the substantive charges against [him]" as well as information that his attorneys could have used to impeach "the motives, bias, and credibility of Mr. al[-]Fadl." El-Hage Br. 105.

2.      El-Hage's Motion for a New Trial Was Properly Denied by the District Court.

Judge Duffy ruled, based on consideration of the totality of the circumstances, that it was "entirely appropriate to consider the WitSec personnel as part of the prosecution team." *Bin Laden*, 397 F. Supp. 2d at 485. We need not decide whether we agree with that assessment because we fully agree with Judge Duffy's ultimate conclusion, based on his meticulous analysis of each item of undisclosed information, that "none of the undisclosed material in the video-teleconferences is sufficient to undermine confidence in the verdict." *Id.* at 518.

As a preliminary matter, we observe that Inspector Doe and his colleagues did not "*intentionally* violate[ ]" any duty of disclosure they owed to El-Hage in light of the fact that "they had no idea they were obliged to produce [the tapes]" in discovery. *Bin Laden*, 397 F. Supp. 2d at 488-89; *see also id.* at 486 (finding that "[i]t is clear . . . that Inspector Doe then had, and likely still has, no idea that videotapes like the ones he created are extremely likely to contain material discoverable pursuant to *Brady*, *Giglio*, Jencks or similar authority"); *id.* at 487 (noting that neither Inspector Doe nor Supervisory Inspector Mike had "receiv[ed] any training within the last nine to ten years regarding government disclosure obligations"; that Supervisory Inspector Mike appeared never to have received such training at any point during his twenty-three years of service with the USMS; and that neither Doe and Mike's supervising officers nor "the four to five [c]ase [m]anagers on al-Fadl's case were any better informed of their obligations").

70

Insofar as the videotapes did contain some Jencks Act material, these statements did not "[ ]either individually, [ ]or as a whole, . . . rise to the level of 'evidence of such high value that it could not have escaped [the prosecutors'] attention.'" *Id.* at 509 (*quoting Hilton*, 521 F.2d at 166); *see also id.* at 490-506 (specific factual findings supporting this conclusion); *cf. Hilton*, 521 F.2d at 166 (holding that if the government has not "deliberately suppresse[d] evidence or . . . ignore[d] evidence of such high value that it could not have escaped [the government's] attention, . . . a new trial is required only if there is a significant chance that this added item, developed by skilled counsel, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction").

In addition, pursuant to our evaluation of "the undisclosed [Jencks Act] [m]aterial and the potential *Brady/Giglio* material in light of all the evidence presented against El-Hage," we agree with the District Court that "there is no 'reasonable probability that had the evidence been disclosed, the result [of the proceeding] would have been different.'" *Bin Laden*, 397 F. Supp. 2d at 518 (quoting *Gonzalez*, 110 F.3d at 943); *see also id.* at 514-18 (specific factual findings supporting this conclusion).

Accordingly, because we agree with the District Court's determination that "none of the undisclosed material in the video-teleconference[ ] [tapes] is sufficient to undermine confidence in the verdict," *id.* at 518 (internal quotation marks omitted), we conclude that the District Court did not err—let alone abuse its discretion—in declining to grant El-Hage's motion for a new trial. *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008) ("Where a defendant's '*Brady* claim was raised in a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, we review the denial of the motion for abuse of discretion.'" (quoting *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002));[43] *cf.*

---

[43] El-Hage contends that we should not review the District Court's denial of his Rule 33 motion under a deferential standard because the "[judge] that decided Mr. El-Hage's Rule 33 motion . . . was not in a position superior to this Court, since it did not preside over [El-Hage's] trial." El-Hage Reply Br. 32-33. It is true that, when a criminal defendant brings a motion for a new trial based on newly discovered evidence, and the district judge who rules on the defendant's motion for a new trial is the same district judge who presided over the defendant's original trial, we accord "great deference" to that court's weighing of the evidence because, having "'presided over the trial[,] . . . [it] is better able to determine the effect the new materials would have had.'" *Gonzales,* 110 F.3d at 943 (quoting *United States v. Petrillo*, 821

*Strickler v. Greene*, 527 U.S. 263, 281 (1999) (noting that even where the prosecution has "breach[ed] [its] broad obligation to disclose exculpatory evidence[,] . . . *there is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict*") (emphasis added); *United States v. Jackson*, 345 F.3d 59, 77 (2003) ("'Where the government's Jencks Act violation is inadvertent . . . the failure to disclose may be disregarded *if there is no reasonable probability that had the evidence been disclosed, the result would have been different.*'" (quoting *Gonzalez*, 110 F.3d at 943) (alteration omitted) (emphasis added)). Accordingly, even if we were to conclude that El-Hage was entitled to receive the videotapes at issue, he would not be entitled to a new trial because the videotapes do not undermine his conviction.

On appeal, El-Hage renews his claims that (1) "[al-Fadl] was the foundation of the government's case," *see* El-Hage Reply Br. 24, and (2) the videotapes contained information that would have critically undercut al-Fadl's testimony, *see, e.g.*, El-Hage Br. 133 ("[B]ecause the content of the videoconferences was not disclosed at trial . . . Mr. al[-]Fadl was free to lie to the jury, and conceal important aspects of his cooperation and the benefits accruing to him as a result, with impunity."); *id.* at 141 ("[T]he videoconference transcripts provide repeated evidence that Mr. al[-]Fadl, in his trial testimony, vastly overstated his knowledge, and fudged the time period over which it spanned."), so that (3) the lack of timely disclosure deprived El-Hage of the opportunity to challenge effectively the government's case, El-Hage Reply Br. 23-24 (expressing the view that "the government's case [with]

F.2d 85, 88 (2d Cir. 1987)). This is not, however, the core reason why we defer to the district court. Rather, our core reason stems from the text of Rule 33 of the Federal Rules of Criminal Procedure, which entrusts decisions as to whether a new trial should be granted to the discretion of the district court. *See* Fed. R. Crim. P. 33 (providing that "[u]pon the defendant's motion, the court *may* vacate any judgment and grant a new trial if the interest of justice so requires") (emphasis added); *cf. Wilton v. Seven Falls Co.*, 515 U.S. 277, 286-87 (1995) (noting that, by "provid[ing] that a court '*may*'" exercise particular authority, a statute "[o]n its face, . . . . [contains] [a] textual commitment to discretion, and the breadth of leeway we have always understood [discretion] to suggest"); *In re Application of Malev Hungarian Airlines*, 964 F.2d 97, 104 (2d Cir. 1992) (noting that a "statute [that] uses the term 'may,' . . . in describing the court's power to respond to a request . . . clearly lodg[es] discretion in the district court. . . . confirm[ing] that abuse of discretion is the applicable standard [of review]").

Mr. al[-]Fadl . . . neutralized entirely by a cross-examination augmented by the materials in the videoconference transcripts[ ] would be so damaged that a new trial is required under any of the applicable legal standards"). We reject these claims for the reasons stated in the District Court's opinion. *See Bin Laden*, 397 F. Supp. 2d at 515-18 (discussing the "independent evidence and testimony corroborat[ing] al[-]Fadl's testimony on . . . subjects relating to El-Hage").

El-Hage also contends that the videotapes contained "substantive evidence undermining an important perjury charge against [him]." El-Hage Br. 134. Specifically, he claims that, in the course of the videoconferences, al-Fadl relayed statements made by a third party that, El-Hage contends, would have established that the al Qaeda member who went to Lake Victoria in 1996 to investigate the death of one Abu Ubaidah al Banshiri was someone other than El-Hage. *Id.* at 139 n.49 (claiming that the statements "establish that al Qaeda sent someone else—a member of the 'Tirana' group, aligned with the Egyptians—and not Mr. El-Hage, to search for Mr. al Banshiri and confirm [al Banshiri's] death in the ferry accident") (emphasis omitted); *cf. Bin Laden*, 397 F. Supp. 2d at 512 n.56 (noting that "El-Hage's alleged travel to Lake Victoria in order to investigate al-Banshiri's drowning was relevant to the [criminal] case [as a whole] as it provided one of the overt acts of the charged conspiracies" and that "in the perjury counts against El-Hage, the [g]overnment alleged El-Hage lied to the Grand Jury about conducting the investigation, and about knowing of al-Banshiri's death").

We note our agreement with the observation of the District Court that "excerpts of the actual conversation between al-Fadl and [the third party] . . . clearly show that" the third party never made the allegedly exculpatory statements in question; rather, "al-Fadl simply misheard" what the third party was saying. *Bin Laden*, 397 F. Supp. 2d at 513 n.58. We also agree with the District Court that, even if al-Fadl had been reporting the third party's statements accurately, "[n]othing in th[e] statement precludes

the possibility that El-Hage went to investigate al-Banshiri's death." *Id.* at 513. As the District Court

observed,

> El-Hage's defense to the relevant charges was not that El-Hage did not travel to Lake Victoria
> to investigate the death of a passenger on a ferry. In fact, in his Grand Jury testimony, El-Hage
> admitted going to Lake Victoria to investigate the drowning death of a passenger in the ferry
> accident that killed al-Banshiri. El-Hage claimed, however, that he was investigating the death
> of "Adel Habib" and further claimed that he did not know that "Adel Habib" was also known
> as Abu Ubaidah al-Banshiri. Notably, at trial the [g]overnment presented the eyewitness
> testimony of Ashif Juma, al-Banshiri's brother-in-law, who recounted how he saw El-Hage at
> Lake Victoria investigating al-Banshiri's death.

*Id.* (alterations and internal quotation marks omitted); *see also id.* ("Essentially, [El-]Hage contended that

he just happened to have been at Lake Victoria investigating the death of somebody who just happened

to be on the same ferry as the military commander of al Qaeda." (internal quotation marks omitted)).

Accordingly, we reject El-Hage's claim that al-Fadl's second-hand account of "the events surrounding

the death of [al Banshiri]," El-Hage Br. 134, was relevant to—let alone undermined—the perjury

charge of which the jury convicted him.

Bearing in mind the liberty interests that El-Hage has at stake, we can state with confidence that

the material on the tapes, taken individually or as a whole, was not so helpful to El-Hage's case that,

had it been disclosed to El-Hage before trial, there is a reasonable probability that the jury would not

have convicted him.

## G. El-Hage's Claim under the Cumulative Error Doctrine

El-Hage next contends that even if the errors[44] he has alleged "do not individually warrant

reversal, their accumulation mandates relief under the 'cumulative error' doctrine." El-Hage Br. 280.

In making this claim, he identifies three additional decisions of the District Court—pertaining to (1) the

---

[44] These asserted errors consist of (1) El-Hage's inability to personally review classified discovery, *see* Part II.C.4, *ante*; (2) the government's disclosure of certain documents to the District Court but not to El-Hage's counsel, *see In re Terrorist Bombings of U.S. Embassies in East Africa (Fourth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008); (3) El-Hage's failure to receive timely disclosure of the videotapes documenting the government's conferences with Jamal al-Fadl, *see* Part II.F.5, *ante*; (4) the admission of custodial statements made by El-Hage's co-defendants, *see* Part II.E.1, *ante*; and (5) the District Court's refusal to sever his trial from the trials of his co-defendants, *see* Part II.D, *ante*. El-Hage Br. 280.

government's failure to preserve transcripts of certain intercepted conversations, (2) the jury's purported knowledge that defendants were shackled at trial, and (3) the denial, in part, of El-Hage's request for a bill of particulars—that, he claims, "augmented the prejudice and unfairness" of his trial and thereby rendered it fundamentally unfair. *Id.* at 281.

The cumulative error doctrine comes into play only where "the total effect of the errors . . . found . . . cast[s] such a serious doubt on the fairness of the trial that the convictions must be reversed." *United States v. Guglielmini*, 384 F.2d 602, 607 (2d Cir. 1967). As discussed above, we conclude that the principal "errors" upon which El-Hage relies, *see* note 44, *ante*, were not, in fact, errors. Accordingly, the only remaining question is whether any of the three additional "errors" noted above amount to trial errors that, when taken together, support a claim of cumulative error.

1.   The Government's Failure to Preserve Recordings of Intercepted Telephone Conversations

During trial, counsel for El-Hage determined that the original tape recordings of some of the phone conversations recorded from the cellphone and landline in Nairobi, *see In re Terrorist Bombings of U.S. Embassies in East Africa (Fourth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008), had not been preserved. Tr. 3944. Defense counsel argued that the loss of that material was potentially prejudicial to El-Hage because such material was more likely to be exculpatory than inculpatory. *Id.* at 3946 (counsel for El-Hage, noting that "the agency taking down notes or translations of those telephone calls obviously [would not] take very many notes of the calls that they think are not relevant to a possible contact"). The District Court observed that this concern could be addressed by means of "a stipulation that every telephone conversation made between [El-Hage and the al Qaeda members under surveillance] did not contain inculpatory material," *id.* at 3946, or a ruling, pursuant to Rule 1004

of the Federal Rules of Evidence,[45] that the parties could introduce "substitute evidence," such as summaries prepared by the government, to establish the nature of the missing recordings, *id.* at 3947. El-Hage's attorneys, however, argued that because the government had failed to preserve the tapes, the government should be barred from introducing any summaries "as a sanction" for its conduct. *See id.* at 3948.

The District Court denied this request, stating that it saw "no basis in anything . . . presented . . . to conclude that there has been any bad faith on the part of the government or deliberate destruction by the government or anything which would lead to the imposition of sanctions . . . ." *Id.* at 3950; *see also id.* at 3958 ("Just so the record is clear, the application for the imposition of sanctions against the government is denied because the Court finds the absence of any basis to assume that there was bad faith on the part of the government."). Instead, the District Court ruled that it would allow both parties to benefit from the best evidence rule. *See id.* at 3957; *see also* Fed. R. Evid. 1004. As the District Court explained, the government's ability to introduce summaries would be "a function of what it is that the defendant seeks to introduce," Tr. 3957, such that if El-Hage wished to introduce a statement "to show that he was engaged in a legitimate business activity, and the government has a similar document which shows that [this was] code language or that it was really for some other purposes," the government could introduce its document in rebuttal, *id.* at 3958.

On appeal, El-Hage contends that (1) the government's failure to preserve the tapes amounted to "spoliation" of evidence, El-Hage Br. 282, and (2) the District Court's proposed remedy did not adequately address the government's conduct, *id.* at 283. We disagree.

---

[45] Rule 1004 provides that "[t]he original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if . . . [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith." Fed. R. Evid. 1004(1).

"'Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 457 (2d Cir. 2007) (quoting *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999)). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). In addition, "[o]nce a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence." *Id.*

A review of the record reveals that the recordings at issue were made by intelligence agents "not in connection with a view to criminal prosecution but for intelligence purposes." Tr. 3958. Nor is there any evidence that the intelligence agents who created the recordings knew or should have known that they could be used in connection with a criminal inquiry. Accordingly, because the custodians of the recordings were not on actual or constructive notice that this evidence might be relevant to future litigation, the government had no obligation to preserve the recordings at the time that they were destroyed.

Even if the government had been under an obligation to preserve the tapes, El-Hage has pointed to no evidence that the tapes were intentionally destroyed, and therefore the destruction of the tapes could not have amounted to spoliation. *See Fujitsu Ltd.*, 247 F.3d at 436.

We can conclude with confidence that the recordings were not intentionally destroyed based on the fact that the government was itself disadvantaged by the destruction of the tapes. As the government explained to the District Court,

> there are great calls that are missing. I'll give one example. Mr. El-Hage, in his legitimate
> enterprise efforts, passed license plate numbers to somebody else and when you take the license

77

plate numbers and you put them together, you get the phone number of a terrorist overseas. We would love to have that telephone call. We don't. . . . Whoever listened to the tapes did not know what we all know today, which is what some people had done, [and] what some phone numbers meant.

Tr. 3954. The District Court agreed, finding that, "as the government has indicated, it has not been advantaged but [rather] disadvantaged by virtue of the failure to preserve this material." *Id.* at 3958. Our independent review of the record leads us to the same conclusion.

Taking into account the background circumstances described by the government, no prophylactic, punitive, or remedial purpose would have been served by imposing sanctions upon the government. *Cf. Goodyear Tire & Rubber Co.*, 167 F.3d at 779 (noting that "[a]lthough a district court has broad discretion in crafting a proper sanction for spoliation, we have explained that the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine"). Quite apart from the fact that the government was under no obligation to preserve the tapes in question, there was no need to punish it for having failed to preserve the tapes, or to otherwise deter it from undertaking any similar action in the future, because the government did not intentionally destroy tapes. *See id.* (observing that, where spoliation occurs, "[t]he sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party'" (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998))).

The only question before the District Court here was how to mitigate any arguable prejudice to El Hage. The District Court adequately addressed this question by "permitt[ing] . . . El-Hage to offer in evidence transcripts of those [communications] which, because of the destruction of the originals, will constitute the best evidence." Tr. 3949. For this reason, we perceive no error or abuse of discretion in the District Court's refusal to impose any sanctions on the government. *Cf. Fujitsu Ltd.*,

247 F.3d at 436 (concluding that, in light of the trial court's finding that the party moving for sanctions "had failed to demonstrate that [the non-moving party's] action was an intentional attempt to destroy evidence[,] . . . the trial court did not abuse its discretion in refusing to sanction [the non-moving party] for spoliation").

2.    El-Hage's Allegation that the Jury Was Aware that Defendants Were Shackled

El-Hage also contends that, although "[t]he District Court went to great lengths to conceal from the jury the fact that the defendants were shackled at all times in the courtroom during trial[,] . . . . the effort was unavailing, as the jury became aware of the shackling." El-Hage Br. 295. El-Hage claims, without explanation, that "[he] was . . . undeniably prejudiced by the jury's knowledge, however inadvertent." *Id.* at 297.

The Supreme Court, in *Holbrook v. Flynn*, observed that shackling, although an "inherently prejudicial practice . . . [is] permitted . . . where justified by an essential state interest specific to each trial." 475 U.S. 560, 568-69 (1986). In the instant case, the essential state interest—the need to protect court personnel and the public from physical danger—was clear.

At a pretrial hearing held on June 22, 1999, the District Court denied the request of El-Hage's counsel that a letter written by El-Hage be made public, on the grounds that the Court "didn't know whether there are codes in this letter," Hearing Tr. 78, and the "concern[ ] that this Court not become the medium by which the defendants seek a larger audience," *id.* at 80. In response to this ruling, El-Hage became belligerent and had to be restrained as he angrily raced toward the bench. *See* Benjamin Weiser, *Terrorism Suspect Charges Towards Judge, but is Tackled,*" N.Y. Times, June 23, 1999, at B6 (describing how El-Hage "leaped out of his chair . . . and raced toward the judge, causing chaos before he was tackled and subdued by a United States marshal" as well as how, once returned to the courtroom "surrounded by marshals, [El-Hage] shouted out again, saying that he was angry that Judge

79

Sand had refused to read aloud a letter [El-Hage] had sent [the Court]"). On November 1, 2000, two of El-Hage's co-defendants, after meeting with their attorneys in the high-security wing of the Metropolitan Correctional Center, stabbed a guard in the eye. *See* Benjamin Weiser, *Reporter's Notebook; Quandary in Terror Case*, N.Y. Times, Nov. 12, 2000, at A39 (describing the incident and reporting that "[o]fficials have said that the stabbing may have been part of an escape attempt that may have involved a plan to take hostages" and that "the assault on [the guard] was the second incident in which a defendant awaiting trial in [this] case was accused of wrongdoing"); *see also* Letter of Sam A. Schmidt, co-counsel for El-Hage, dated Nov. 14, 2000, dkt. no. 303 (referring to the "incident at the [MCC] on November 1, 2000").

In light of these circumstances, we cannot say that it was arbitrary or, for that matter, incorrect for the District Court to conclude that the physical restraints of which El-Hage complains were "necessary to maintain [the] safety or security" of the other occupants of the courtroom. *Hameed v. Mann*, 57 F.3d 217, 222 (2d Cir. 1995) (observing that "[t]he trial court has discretion to order physical restraints if the court has found those restraints necessary to maintain safety or security," and that when the trial court has followed applicable law in making its underlying findings of fact, "its decision is reviewable for abuse of discretion").

3.      The Partial Denial of Defendants' Motion for a Bill of Particulars

Before trial, El-Hage and his co-defendants moved the District Court to direct the filing of a bill of particulars. As we have observed, "[a] bill of particulars 'enables a defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.'" *United States v. Rigas*, 490 F.3d 208, 237 (2d Cir. 2007) (citation and alterations omitted); *cf. Hamling v. United States*, 418 U.S. 87, 117 (1974) (explaining that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge

against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense"); *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) (citing *Hamling*, 418 U.S. at 117).

In the instant case, El-Hage and his co-defendants sought detailed information about "the overt acts [allegedly undertaken] in furtherance of the charged conspiracies, . . . identification of [unindicted] co-conspirators, [and] the formation of the conspiracies [alleged—namely,] when and how each defendant joined the conspiracies, and the role played by each [d]efendant in the various conspiracies." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 235 (S.D.N.Y. 2000). The District Court, after careful review of the content of the indictment, granted El-Hage's request for a bill of particulars as to a number of points, *see id.* at 236, 239-42; and denied El-Hage's request for a bill of particulars as to several other points, *see id.* at 238 (concluding that the allegations set forth in the indictment "provide sufficient detail to permit defense counsel reasonably to focus their investigation"), *id.* at 243 (noting that because "it is not the [g]overnment's burden at trial to establish a precise chronology as to when each defendant, as well as other unindicted co-conspirators, joined the conspiracies[,] . . . [that information] is not necessary to the [d]efendants' preparation"), *id.* (determining that, because the "'Background' section [of the indictment] does not constitute a criminal charge which the [d]efendant must answer . . . further detail as to the matters contained in the Background section [is not] necessary to the [d]efendants' preparations").

On appeal, El-Hage claims without elaboration that the indictment by which he was charged was "too vague to permit an adequate defense in response," El-Hage Br. 294, and that the bill of particulars ordered by the District Court "was not sufficient to cure the underlying problem of the Indictment's overarching scope," *id.* at 295. El-Hage does not, however, identify (1) any particular

charge on which further detail would have been helpful or (2) any specific errors by the District Court. Nor, upon review of the record, can we.

In sum, because none of the decisions identified by El-Hage amounted to trial error, we deny El-Hage's request for relief under the cumulative error doctrine.

## H.    El-Hage's Challenge to the Sentence Imposed by the District Court

With respect to the sentence of life imprisonment imposed by the District Court, El-Hage contends that (1) the underlying U.S. Sentencing Guidelines ("U.S.S.G.") calculation contained four errors that inflated his offense level and the corresponding sentencing range, and (2) the District Court improperly sentenced him pursuant to the mandatory application of the Guidelines.  For the reasons explained below, we reject all of El-Hage's challenges to the District Court's calculation of his Guidelines range.  We nevertheless vacate El-Hage's sentence because it resulted from the mandatory application of the Guidelines, and we therefore remand his case for resentencing pursuant to *United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005).

### 1.    The Guidelines Calculation

As set forth in the Pre-Sentence Report ("PSR") prepared by the United States Probation Office for the Southern District of New York, El-Hage's base offense level was 66, his criminal history category was VI, and his corresponding sentence under the Guidelines was life imprisonment.  The offense level of 66 comprised a base offense level of 43—as determined by U.S.S.G. § 2A1.5(c)(1),[46] which contains a cross-reference to § 2A1.1 in cases where a conspiracy to murder results in the death of a victim—and 23 additional points arising from five enhancements.[47]  Those enhancements are as follows: (1) a three-level enhancement pursuant to § 3A1.1(a) because El-Hage targeted his victims on

[46] The 2001 Edition of the U.S. Sentencing Guidelines was used in the calculation of El-Hage's sentencing range.  All references to the Sentencing Guidelines contained herein refer to that edition of the manual.

[47] El-Hage's convictions of three conspiracy counts were "grouped" pursuant to U.S.S.G. § 3D1.2.

the basis of their national origin (the "hate crime enhancement"); (2) a three-level enhancement pursuant to § 3A1.2(a) because the intended victims included government officers and employees whose status as such motivated the offenses (the "official victim enhancement"); (3) a three-level enhancement pursuant to § 3B1.1(b) because El-Hage was a manager or supervisor of the conspiracy (the "role-in-the-offense enhancement"); (4) a two-level enhancement pursuant to § 3C1.1 for obstruction of the administration of justice; and (5) a twelve-level enhancement pursuant to § 3A1.4(a) because the felonies involved were intended to promote a federal crime of terrorism (the "terrorism enhancement"). Section 3A1.4 further mandated that El-Hage's criminal history category should be set at VI.

      2.      El-Hage's Challenge to the Calculation of the Base Offense Level of 43

El-Hage argues that his conspiracy convictions did not warrant a base offense level of 43—as specified by U.S.S.G. § 2A1.5(c)(1) for cases where a murder conspiracy results in the death of a victim—because he was not "in any way responsible for, or even aware of, any fatalities from the embassy bombings." El-Hage Br. 312. In support of his position, El-Hage maintains that no evidence in the record shows that he was "involved in any discussions where the bombings were discussed." *Id.* at 313. Assuming *arguendo* the accuracy of El-Hage's characterization of the record, we find no merit in his challenge to the base offense level determined by the District Court. Pursuant to § 2A1.5, the offense of conspiracy to commit murder entails a base offense level of 28 unless "the offense resulted in the death of a victim," in which case the offense level of 43 set forth in § 2A1.1 applies. Because the jury convicted El-Hage of multiple counts of conspiracy to commit murder and also found that over two hundred deaths resulted from these murder conspiracies, the jury's findings show that El-Hage was a member of a conspiracy that resulted in at least one death. The Guidelines require no additional

measure of responsibility or awareness. It is plain, therefore, that a base level of 43, which corresponds to a murder conspiracy that results in at least one death, governs the conduct at issue here.

        3.        El-Hage's Challenges to the Hate Crime and Government Victim Enhancements

El-Hage challenges the application of the hate crime and government victim enhancements on multiple grounds, including that they permit "duplicative punishment" for the same underlying offense, El-Hage Br. 300.

On the question of "double counting," we observe at the outset that "a district court calculating a Guidelines sentence may apply multiple Guidelines provisions based on the same underlying conduct where that is the result clearly intended by Congress and the Sentencing Commission. While such calculations may involve 'double counting' in a literal sense, they do not involve *impermissible* double counting." *United States v. Maloney*, 406 F.3d 149, 152 (2d Cir. 2005). El-Hage contends that the hate crime and government victim enhancements are duplicative of the terrorism enhancement and the underlying offenses of conviction. We disagree. Each of these enhancements "serves a distinct purpose or represents a discrete harm," *id.* at 153, and none of them is subsumed by El-Hage's offenses of conviction.

The hate crime enhancement applies when "the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, *national origin*, ethnicity, gender, disability, or sexual orientation of any person." U.S.S.G. § 3A1.1(a) (emphasis added). The government victim enhancement is applicable when "the victim was a government officer or employee; a former government officer or employee; or a member of the immediate family of any of the above, and the offense of conviction was motivated by such status." *Id.* § 3A1.2(a). Finally, the terrorism enhancement is applicable "if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." *Id.* § 3A1.4(a).

84

Each of these enhancements addresses a "discrete harm," *Maloney*, 406 F.3d at 153, arising from El-Hage's underlying conduct: The hate crime enhancement covers the selection of victims based on their national origin, while the government victim enhancement deals with the selection of victims based on their status as government employees. The terrorism enhancement, as its name indicates, addresses acts of terrorism. While it may be that some offenses, such as those committed by El-Hage, trigger all three enhancements because they constitute (1) acts of terrorism that targeted victims based on (2) their perceived national origin and (3) their status as government employees, it is equally plain that a terrorist act need not necessarily target government victims or select its victims on the basis of national origin; nor do all offenses that target victims based on their (a) national origin or (b) status as government employees constitute acts of terrorism; and, almost needless to say, crimes targeting victims on the basis of national origin need not entail any animus whatsoever toward government employees and vice versa. Accordingly, we see no "double counting," much less impermissible double counting, arising from the application of these enhancements.[48]

Equally devoid of merit is El-Hage's contention that the hate crime and government employee enhancements are "expressly accounted for in the statutory violation[s]" of which he stands convicted. El-Hage Br. 301, 308. El-Hage argues that his conviction for conspiracy to murder nationals of the United States obviates the need for the hate crime enhancement and his conviction for conspiracy to murder officers or employees of the United States obviates the need for the government victim enhancement. To the contrary, it is the very fact that he was convicted of these offenses that justifies the application of the hate crime and government victim enhancements. As noted above, El-Hage's base offense level of 43 resulted from the application of U.S.S.G. § 2A1.5(c)(1) (conspiracy to commit

---

[48] With respect to the application of the government victim enhancement, our conclusion is further supported by the application notes for this provision, one of which instructs: "Do not apply this adjustment if the offense guideline specifically incorporates this factor. . . . The only offense guideline in Chapter Two, Part A that specifically incorporates this factor is § 2A2.4 (Obstructing or Impeding Officers)." U.S.S.G. § 3A1.2 cmt. n.3.

murder), which instructs a sentencing court to apply § 2A1.1 (first degree murder) in cases where a conspiracy to murder results in the death of a victim. This provision is applicable to all murder conspiracies and contains no additional punishment for conspiracies that target victims based on their national origin or their status as government employees. In the absence of the hate crime and government employee enhancements, therefore, El-Hage would incur no additional penalty for the "discrete harms" of targeting victims based on their national origin and status as government employees. Accordingly, there is no merit in El-Hage's argument that the enhancements are "expressly accounted for" in his offenses of convictions.

El-Hage further challenges the application of the hate crimes enhancement on the grounds that (1) "*political* beliefs," not hatred, motivated his actions, Appellant's Br. at 304, and (2) the victims of the conspiracy were targeted for their U.S. citizenship, not their national origin.

The line El-Hage draws between political activism and hate as the basis for the selection of his victims is a false distinction. It may be that some who choose their victims on the basis of their "actual or perceived race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation," U.S.S.G. § 3A1.1(a), do so for reasons that could be construed in some fashion as "political" in nature, and others do so for reasons more closely akin to blind, irrational hatred. Even assuming that a court could classify some motives as essentially "political" and others as rooted in "hatred," however, such a classification would be utterly irrelevant to the applicability of the hate crime enhancement. This is so because the enhancement does not turn on an evaluation of the considerations that motivated a defendant's decision to target victims based on their race, color, religion, or other enumerated characteristic. The hate crime enhancement applies if the defendant "intentionally selected any victim"

86

on the basis of one of the factors listed above, § 3A1.1(a), and, because there can be no "good reasons" for doing so, the underlying motivation is simply beside the point.[49]

Even less persuasive is El-Hage's assertion that the conspiracy targeted its victims based on their U.S. citizenship rather than their national origin. El-Hage maintains that the record contains no "evidence that al Qaeda distinguished between foreign-born or naturalized United States citizens, and those born within the nation's borders." El-Hage Br. 306. Accordingly, it was citizenship, El-Hage urges, and not national origin that was the basis for the conspiracy's selection of its victims. This argument runs counter to the jury's verdict that El-Hage conspired to murder "nationals of the United States," in light of the fact that a U.S. national is not necessarily also a U.S. citizen, *see* 8 U.S.C. § 1408 (listing categories of people who "shall be nationals, but not citizens, of the United States at birth"), while all citizens are nationals of the United States. In addition, the hate crime enhancement applies when a defendant selects his victims based on their "actual or perceived" national origin, U.S.S.G. § 3A1.1(a), and therefore it was not necessary for al Qaeda to distinguish between nationals and citizens, or naturalized and birthright U.S. citizens, so long as it perceived the victims as having a U.S. national origin. Finally, the record is devoid of evidence, and El-Hage points to none, indicating that al Qaeda distinguished between U.S. citizens—the so-called "real" targets of the conspiracy—on the one hand, and, for instance, permanent U.S. residents, on the other. Accordingly, El-Hage's argument that the conspiracy selected its victims based on citizenship, and not national origin, is meritless.

With respect to the government victim enhancement, El-Hage urges that it "should not apply to United States military personnel engaged in combat on foreign soil . . . because it would expose all soldiers who oppose United States military personnel on the battlefield abroad to criminal prosecution

_____

[49] On the irrelevance of a motive to the question of whether conduct is intentional, see, for example, *United States v. Washington*, 705 F.2d 489, 493 (D.C. Cir. 1983) ("Proof of a good motive . . . is not probative on the issue of . . . intent.").

here for their action." El-Hage Br. 308-09. This contention is absurd. El-Hage does not stand convicted of being a soldier fighting against the U.S. military engaged in combat on the battlefield. Quite the opposite: El-Hage was convicted of "conspiring to murder officers or employees of the United States" in connection with the unprovoked bombings of the American Embassies in Kenya and Tanzania—terrorist attacks that resulted, as the jury found, in the deaths of U.S. government employees. The jury's verdict alone is sufficient to trigger the government victim enhancement, and El-Hage's reference to counterfactual battlefields and soldiers engaged in combat does not lessen the applicability of that enhancement.

4. The Role-in-the-Offense Enhancement Is Supported by the Record

El-Hage also challenges the District Court's determination that he was a manager or supervisor of the conspiracy and thus subject to a three-level enhancement pursuant to U.S.S.G. § 3B1.1(b). We review the findings of a district court on a defendant's role in the conspiracy for clear error, *see, e.g.*, *United States v. Kilkenny*, 493 F.3d 122, 130 (2d Cir. 2007), and perceive none here. At El-Hage's sentencing hearing, the District Court explained that "[El-Hage] was relied on as being the representative of Bin Laden [and] was the person authorized to convey out to the field what it was that Bin Laden did or did not wish to occur . . . [including] what the objectives [were] for the Kenyan cell." The record developed by the government at trial fully supports the District Court's determination. As set forth in detail above, there is record evidence that El-Hage (1) participated in private meetings with Bin Laden, (2) was the "paymaster" for Bin Laden's enterprises, (3) procured fake travel documents, (4) served as the head of the Nairobi Al Qaeda cell, and (5) delivered messages directly from Bin Landen directing the Nairobi cell to prepare for military activity. *See* Part II.B.1, *ante*. In light of this evidence, we see no error, much less clear error, in the District Court's finding that El-Hage was a manager or

88

supervisor of the conspiracy, and we therefore reject El-Hage's challenge to the role-in-the-conspiracy enhancement applied by the District Court.

5.      El-Hage Is Entitled to Be Resentenced

As the government acknowledges, El-Hage's sentence, imposed pursuant to a mandatory application of the Sentencing Guidelines, violated the teachings of *United States v. Booker*, 543 U.S. 220 (2005).  Appellee's Br. at 489-90.  Because El-Hage made a timely objection to the District Court's mandatory application of the Sentencing Guidelines, we vacate his sentence and remand the case to the District Court for resentencing pursuant to *United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005). Following the procedure set forth in *United States v. Jacobson*, 15 F.3d 19, 21-22 (2d Cir. 1994), any party seeking appellate review of the sentencing decision on remand shall within ten days so inform the Clerk of Court.  Jurisdiction will then be automatically restored to this Court without the need for an additional notice of appeal, and the matter will be referred to this panel for disposition.

*    *    *

In pretrial proceedings stretching over a period of twenty-seven months and a trial of six months, Judge Leonard B. Sand presided over a complex and broad-ranging case, and imposed sentences, with commendable care, patience, and fairness.  The post-conviction proceedings, including extended evidentiary hearings, were conducted with equal thoroughness by Judge Kevin Thomas Duffy.  Our review of this complex and difficult case leaves us confident that defendants received a fair trial, and we commend the two district judges who presided over these proceedings for their learned and thorough rulings on the numerous issues—some of first impression—raised in this complicated case.  We also recognize their conscientious efforts to ensure that the rights of defendants and the needs of national security were equally met during these proceedings.

### III.    CONCLUSION

To summarize, we hold:

(1) The indictment under which Al-'Owhali proceeded to trial sufficiently alleged the "gateway factors" rendering Al-'Owhali death-eligible pursuant to *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000);

(2) The evidence presented at trial by the government was sufficient to support (a) El-Hage's conspiracy convictions and (b) Odeh's convictions for the conspiracy and substantive offenses with which he was charged;

(3) Pursuant to the Classified Information Procedures Act, 18 U.S.C. app. 3, the District Court was authorized to restrict access to classified information only to those with a security clearance, and its decision to do so here did not violate El-Hage's Sixth Amendment right to counsel, his Fifth and Sixth Amendment rights to present a defense, or his Fifth and Sixth Amendment rights to be present during a crucial stage in his trial;

(4) The District Court did not err in denying El-Hage's motion to sever his trial from that of his co-defendants;

(5) The statements of defendants' co-defendants, co-conspirators, and certain third parties were properly admitted at trial;

(6) Defendants were not prejudiced by the government's failure to produce, until after the trial, transcripts of tapes produced and maintained by the U.S. Marshal Services Witness Protection Program of pretrial video-conferences between a key witness for the government and members of the prosecution team;

(7) Because we perceive no error at trial, there is no merit in El-Hage's suggestion that "cumulative error" deprived him of a fair trial;

(8) The application of certain enhancements to El-Hage's sentencing guidelines calculation was not in error; and

(9) Insofar as El-Hage's sentence resulted from the mandatory application of the U.S. Sentencing Guidelines, he is entitled to be resentenced pursuant to *United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005).

In this opinion, as well as in *In re Terrorist Bombings of U.S. Embassies in East Africa (Fourth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008), and *In re Terrorist Bombings of U.S. Embassies in East Africa (Fifth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008), we have considered all of defendants' claims on appeal and, apart from the matter of El-Hage's resentencing, have found all of them without merit.

For these reasons, the judgments of conviction entered by the District Court against Al-'Owhali and Odeh are **AFFIRMED** in all respects. The judgment of conviction entered against El-Hage is **AFFIRMED** in all respects except that the sentence is **VACATED**, and the case is **REMANDED** to the District Court for the sole purpose of resentencing El-Hage in conformity with *Booker* and *Fagans*. From whatever final decision the District Court makes on this limited remand, the jurisdiction of this Court to consider a subsequent appeal may be invoked by any party by notification to the Clerk within ten days of the District Court's decision, *see United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994), in which event the renewed appeal will be assigned to this panel.